**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WILMINGTON DIVISION**

| | |
|---|---|
| **IN RE:** | **CASE NO:** |
| **JOYCE ANN FRINK** | **16-00093-5-SWH** |
| **DEBTOR** | **CHAPTER 7** |

| | |
|---|---|
| **ALGERNON L. BUTLER, III, Chapter 7** )<br>**Trustee in Bankruptcy for Joyce Ann Frink,** )<br>) | |
| **Plaintiff,** ) | |
| ) | **ADVERSARY PROCEEDING NO.:** |
| **vs.** ) | |
| ) | |
| **JOYCE ANN FRINK,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**COMPLAINT FOR REVOCATION OF DISCHARGE**

NOW COMES Algernon L. Butler, III, as Chapter 7 Trustee for the bankruptcy estate of Joyce Ann Frink, by and through counsel, and complaining of the Defendant alleges and says as follows:

**PARTIES, JURISDICTION AND VENUE**

1.     On January 7, 2016 (the "Petition Date"), Joyce Ann Frink (formerly known as Joyce Keel and/or Joyce Frink Campbell and hereinafter, the "Debtor" and/or "Defendant") filed with the U.S. Bankruptcy Court for the Eastern District of North Carolina (the "Bankruptcy Court") a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), Case No. 16-00093-5-SWH.

2.     Algernon L. Butler, III (the "Trustee" and/or the "Plaintiff") has been duly appointed and is serving as the Chapter 7 Trustee in the Debtor's bankruptcy case.

3.     Upon information and belief, the Defendant is a citizen and resident of Horry County, South Carolina.

4.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157 and 1334.  The Court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984, by the United States District Court for the Eastern District of North Carolina.

5.     This matter is a core proceeding pursuant to 28 U.S.C. § 157.

6.      Venue in this matter is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## GENERAL ALLEGATIONS

### The Settlement Proceeds and Bankruptcy Planning

7.      On or around April 16, 2012, the Debtor retained the law firms of Ferrer, Poirot & Wansbrough (the "Ferrer Firm") and the law firm of Aylstock, Witkin, Kreis & Overholtz (the "Aylstock Firm") to represent her in connection with a product liability claim (the "Product Liability Claim") arising out medical problems and procedures related to the Debtor's use of a defective type II diabetes drug marketed and sold as Actos (pioglitazone), Actosplus Met, Actosplus Met XR, and/or Duetact (hereinafter "Actos").

8.      On June 11, 2014, the Debtor, through the Aylstock Firm as her counsel, filed a complaint in the U.S. District Court for the Western District of Louisiana which case is entitled Myers v. Takeda Pharmaceuticals USA, Inc. (In re: Actos Products Liability Litigation), Civil Action No.: 6:14-cv-1166 (the "Civil Action") seeking damages related to the Product Liability Claim.  A copy of the complaint in the Civil Action is attached hereto as **EXHIBIT A**.

9.      The Civil Action asserts and seeks to recover from the defendants compensatory damages, including medical expenses and economic loss, exemplary damages, punitive damages, costs, and attorneys fees, pursuant to the following cases of action: Negligence; Strict Products Liability – Failure to Warn; Strict Products Liability – Defective Design; Breach of Express Warranty; Breach of Implied Warranty for a Particular Purpose; Breach of Implied Warranty of Merchantability;  Fraud; Fraudulent Concealment; Negligent Misrepresentation; and Consumer Fraud and Deceptive Trade Practices.

10.      On or around May 1, 2015, the Aylstock firm informed the Debtor that the defendants and the committee of plaintiffs' counsel involved in the Civil Action had reached an agreement to resolve claims against the defendants in the Civil Action (the "Settlement Program"), and that the Debtor, in exchange for her participation in the Settlement Program, would receive an individual settlement offer related to the Product Liability Claim (the "Settlement Proceeds").  A copy of a letter dated May 1, 2015 from the Aylstock Firm to the Debtor informing her about the Settlement Program is attached hereto as **EXHIBIT B.**

11.      On or around June 3, 2015, the Aylstock Firm informed the Debtor that the defendants in the Civil Action had agreed, pursuant to the Settlement Program, to pay approximately $2.4 billion to settle approximately 9,000 to 10,500 claims related to injuries caused by Actos.  The Aylstock Firm further informed the Debtor that the actual amount of the Settlement Proceeds was unknown, but that the average settlement award would be between $200,000.00 and $266,000.00 with some awards worth over $1,000,000.00.  A copy of a letter dated June 3, 2015 from the Aylstock Firm to the Debtor informing her about the Settlement Proceeds is attached hereto as **EXHIBIT C.**

12.      Upon information and belief, the value of the Settlement Proceeds was dependent on the number of participants and claims submitted in the Settlement Program and the individual

issues in the Debtor's case including the amount of Actos she ingested and information contained in her medical records.

13.     Upon information and belief, the value of the gross Settlement Proceeds is approximately $245,709.45

14.     On or around June 10, 2015, the Debtor executed before a notary and delivered to the Aylstock Firm a "Settlement Program Consent Form" in which the Debtor agreed to participate in the Settlement Program, waive her right to continue to pursue a lawsuit, and accept the value of the Settlement Proceeds as determined pursuant to the Settlement Program.  A copy of the Settlement Program Consent Form is attached hereto as **EXHIBIT D**.

15.     On July 24, 2015, the Debtor received a briefing from an approved credit counseling agency pursuant to 11 U.S.C. § 109(h).

16.     Upon information and belief, in or around late September 2015, the Debtor sought legal advice from and had an initial consultation with Christopher D. Lane, Esq. regarding a potential bankruptcy filing and based on that consultation, agreed to retain Christopher D. Lane, Esq. to analyze her financial situation and prepare and file her bankruptcy petition, schedules and statement of financial affairs.

17.     On November 14, 2015 the Debtor executed and delivered to the Aylstock Firm a "Bankruptcy Questionnaire" which requested information about prior bankruptcy filings.  The Debtor stated that she had filed a Chapter 13 bankruptcy in the Bankruptcy Court on January 4, 2004 and had received a discharge in June 24, 2004.  A copy of the Bankruptcy Questionnaire is attached hereto as **EXHIBIT E**.

18.     On January 6, 2016 (the date immediately preceding the Petition Date), the Debtor executed and delivered to the Aylstock Firm an Actos Resolution Program Claim Form providing information related to the Product Liability Claim and a certification that she had not been "a party in a bankruptcy action seeking bankruptcy protection."  A copy of the Debtor's Actos Resolution Program Claim Form is attached hereto as **EXHIBIT F.**

19.     On January 7, 2016, the Debtor filed with the Bankruptcy Court her voluntary petition under Chapter 7 of the Bankruptcy Code commencing this case.

20.     Upon information and belief, prior to the Petition Date, the Debtor fulfilled all requirements to participate in the Settlement Program and was eligible to receive the Settlement Proceeds.

21.     The Product Liability Claim, the Civil Action, and the Settlement Proceeds were interests of the Debtor in property as of the Petition Date.

**Debtor's Intended Disposition of the Settlement Proceeds**

22.     Upon information and belief, in or around July or August 2016, after discovering that she was eligible to receive the Settlement Proceeds, the Debtor decided to purchase two

3

parcels of real property respectively located in Bladen and Columbus County, North Carolina and to lease the parcels to third parties in exchange for rental income.

23. Upon information and belief, in order to partially fund the purchase of real property in Bladen and Columbus County, North Carolina, on or around August 11, 2015, the Debtor entered into a contract with US Claims Opco LLC ("US Claims") purportedly to sell to US Claims a portion of the Settlement Proceeds or to give US Claims a security interest in a portion of the Settlement Proceeds (the "US Claims Transfer") in exchange for a sum of approximately $25,000.00.

24. The US Claims Transfer was not made in the ordinary course of the Debtor's business or financial affairs and was an unusual transaction for the Debtor.

25. On August 17, 2015, $24,965.00 was deposited into the Debtor's checking account held at Santee Cooper Credit Union (the "SCCU Account").

26. Upon information and belief, the source of the $24,965.00 deposited into the SCCU Account on August 17, 2015 was the payment by US Claims to the Debtor as consideration for the US Claims Transfer (the "US Claims Funds").

27. Upon information and belief, the Debtor intended to use the US Claims Funds and the balance of the Settlement Proceeds to purchase real property in Bladen and Columbus Counties, North Carolina.

28. On August 22, 2015, the Debtor entered into a contract with Brian and Gina Browning to purchase real estate located in Columbus County, North Carolina for $112,900.00 (the "Columbus County Property").

29. Upon information and belief, the Debtor intended to use the Columbus County Property as a source of rental income.

30. The Debtor's purchase of the Columbus County Property was owner financed and required from the Debtor a down payment of $7,000.00, monthly payments of $825.00 per month thereafter, and a balloon payment of the principal balance on or around August 22, 2016.

31. Upon information and belief, the Debtor used a portion of the US Claims Funds to pay the down payment of $7,000.00 on the Columbus County Property purchase (the "Columbus County Down Payment Transfer").

32. The Columbus County Down Payment Transfer was not made in the ordinary course of the Debtor's business or financial affairs.

33. In approximately October 2015, the Debtor entered into an agreement (the "Columbus County Lease") to lease the Columbus County Property to a third party for $825.00 per month (the "Columbus County Rental Income").

34.     Upon information and belief, the Debtor intended to use income to be received from the rental of the Columbus County Property to satisfy the monthly payments related to the purchase of the Columbus County Property.

35.     Upon information and belief, the Debtor intended to use a portion of the Settlement Proceeds to satisfy the balloon payment related to the purchase of the Columbus County Property.

36.     On September 17, 2015, the Debtor entered into a contract with Richard and Sharon Starkey to purchase real estate located in Bladen County, North Carolina for $72,000.00 (the "Bladen County Property," and collectively with the Columbus County Property "the Properties").

37.     Upon information and belief, the Debtor intended to use the Bladen County Property as a source of rental income.

38.     The Debtor's purchase of the Bladen County Property was owner financed and required from the Debtor a down payment of $10,000.00, monthly payments of $600.00 thereafter, and a balloon payment of the principal balance on or before April 14, 2016.

39.     Upon information and belief, the Debtor did not pay the down payment of $10,000.00.  However, upon information and belief, the Debtor informed Richard and Sharon Starkey that she intended to use a portion of the Settlement Proceeds to satisfy the down payment and balloon payment and that the Debtor expected to receive the Settlement Proceeds prior to April 14, 2016.

40.     Upon information and belief, Richard and Sharon Starkey agreed to allow the Debtor to take possession of the Bladen County Property and fulfill her obligations under the purchase contract upon assurances from the Debtor that they would receive monthly payments of $600.00 and that the principal balance would be paid on or before April 14, 2016.

41.     In approximately October 2015, the Debtor entered into an agreement (the "Bladen County Lease," and collectively with the Columbus County Lease, the "Leases") to lease the Bladen County Property to a third party for $750.00 per month (the "Bladen County Rental Income," and collectively with the Columbus County Rental Income, the "Rental Income").

42.     Upon information and belief, the Debtor intended to use rental income to satisfy the monthly payments related to the purchase of the Bladen County Property.

43.     The Properties, the SCCU Account, the Leases and the right to receive rental income pursuant to the Leases were interests of the Debtor in property as of the Petition Date.

## False Statements and Concealed Property

44.     On January 7, 2016, the Debtor filed with the Bankruptcy Court her voluntary petition under Chapter 7 of the Bankruptcy Code commencing this case.

5

45.      The Debtor filed with the Bankruptcy Court her Schedules and Statement of Financial Affairs with her bankruptcy petition.

46.      The Debtor signed her Schedules under penalty of perjury declaring that "[u]nder penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct."

47.      The Debtor signed her Statement of Financial Affairs under penalty of perjury stating that "I have read the answers on this Statement of Financial Affairs and any attachments, and I declare under penalty of perjury that the answers are true and correct."

48.      The Product Liability Claim, the Civil Action, the Settlement Proceeds, the Properties, the contracts to purchase the Properties, the Leases, the right to receive rental income pursuant to the Leases, the Rental Income, the SCCU Account, the US Claims Transfer, and the Columbus County Down Payment Transfer were required to be disclosed in the Debtor's Schedules and/or Statement of Financial Affairs.

49.      The Debtor falsely failed to disclose in her Schedules, Statement of Financial Affairs and at her Chapter 7 § 341 meeting, her interest in and the existence of the Product Liability Claim, the Civil Action, the Settlement Proceeds, the Properties, the contracts to purchase the Properties, the Leases, the right to receive rental income pursuant to the Leases, the Rental Income, the SCCU Account, the US Claims Transfer, and the Columbus County Down Payment Transfer.

## Schedules

50.      On Question 1 of the Debtor's Schedule A/B, when asked "Do you own or have any legal or equitable interest in any residence, building, land, or similar property," the Debtor disclosed only her interest in real property located in Chadbourn, North Carolina.  The Debtor falsely failed to disclose the existence of or her interest in the Properties.

51.      On Question 17 of the Debtor's Schedule A/B, when asked "Do you own or have any legal or equitable interest in … Deposits of money," the Debtor disclosed only her interest in an account held at State Employees Credit Union.  The Debtor falsely failed to disclose the existence of or her interest in the SCCU Account.

52.      On Question 30 of the Debtor's Schedule A/B, when asked, "Do you own or have any legal or equitable interest in … Other amounts someone owes you," the Debtor answered "No."  The Debtor falsely failed to disclose the existence of or her interest in the Product Liability Claim and the Settlement Proceeds.

53.      On Question 33 of the Debtor's Schedule A/B, when asked: "Do you own or have any legal or equitable interest in … Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment," the Debtor answered "No."  The Debtor falsely failed to disclose the existence of or her interest in the Product Liability Claim and the Settlement Proceeds.

54.     On Question 34 of the Debtor's Schedule A/B, when asked, "Do you own or have any legal or equitable interest in … Other contingent and unliquidated claims of every nature including counterclaims of the debtor and rights to set off claims," the Debtor answered "No." The Debtor falsely failed to disclose the existence of or her interest in the Product Liability Claim and the Settlement Proceeds.

55.     On Question 35 of the Debtor's Schedule A/B, when asked, "Do you own or have any legal or equitable interest in … Any financial assets you did not already list," the Debtor answered "No."  The Debtor falsely failed to disclose the existence of or her interest in the SCCU Account, the Product Liability Claim and the Settlement Proceeds.

56.     On Question 37 of the Debtor's Schedule A/B, when asked, "Do you own or have any legal or equitable interest in any business-related property," the Debtor falsely answered "No" notwithstanding her interest in the Properties as a source of the Rental Income.

57.     The Debtor did not answer Question 44 of the Debtor's Schedule A/B which asked her to list "Any business-related property you did not already list."  The Debtor falsely failed to disclose the existence of or her interest in the Properties, the Leases, and the right to receive rental income pursuant to the Leases.

58.     The Product Liability Claim, the Settlement Proceeds, the Properties, the SCCU Account, the Leases and the right to receive rental income pursuant to the Leases were interests of the Debtor in property as of the Petition Date and were required to be disclosed in her Schedule A/B.

59.     On the Petition Date the following entities were creditors of the Debtor that the Debtor was required to disclose on her Schedule D and/or Schedule E/F: the Aylstock Firm, the Ferrer Firm, US Claims, Brian and Gina Browning, and Richard and Sharon Starkey.

60.     On Schedule D and/or Schedule E/F, the Debtor was required to disclose all of her creditors, but the Debtor falsely failed to disclose on those schedules the following claims and creditors against her:  the claims of the Aylstock Firm, the Ferrer Firm, US Claims, Brian and Gina Browning, and Richard and Sharon Starkey.

61.     The Leases and the contracts to purchase the Properties were executory contracts and/or unexpired leases and were required to be disclosed in the Debtor's Schedule G.

62.     On Question 2 of the Debtor's Schedule G, when asked to list all executory contracts and unexpired leases, the Debtor disclosed only a cell phone contract with Verizon Wireless.  The Debtor falsely failed to disclose the contracts to purchase the Properties and the Leases.

63.     The Rental Income was income regularly received by the Debtor and was required to be disclosed in the Debtor's Schedule I.

64.     On Question 8a of the Debtor's Schedule I, when asked to list "net income from rental property and from operating a business, profession, or farm," the Debtor answered "0.00." The Debtor falsely failed to disclose the Rental Income.

65.     On Question 8h of the Debtor's Schedule I, when asked to list "other monthly income," the Debtor answered "0.00."  The Debtor falsely failed to disclose the Rental Income.

## Statement of Financial Affairs

66.     The Rental Income is income from operating a business during the two previous calendar years and was required to be disclosed in the Debtor's Statement of Financial Affairs.

67.     On her Statement of Financial Affairs in response to question #4 in which the Debtor was asked whether she had any "income from employment or from operating a business during this year or the two previous calendar years," the Debtor disclosed only $4,000.00 in wages.  The Debtor falsely failed to disclose the Rental Income.

68.     The Debtor was a party in the Civil Action within 1 year prior the Petition Date and therefore, the Civil Action was required to be disclosed in the Debtor's Statement of Financial Affairs.

69.     On her Statement of Financial Affairs in response to question #9 in which the Debtor was asked whether "within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding," the Debtor disclosed only a lawsuit filed by Ronnie Williams in which the Debtor had been named a defendant.  The Debtor falsely failed to disclose the Civil Action.

70.     The US Claims Transfer and the Columbus County Down Payment Transfer were made within two years prior to the Petition Date and were not made in the ordinary course of the Debtor's business or financial affairs and therefore, the US Claims Transfer and the Columbus County Down Payment Transfer were required to be disclosed in the Debtor's Statement of Financial Affairs.

71.     On her Statement of Financial Affairs in response to question #18 in which the Debtor was asked whether "within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs," the Debtor responded "No."  The Debtor falsely failed to disclose the US Claims Transfer and/or the Columbus County Down Payment Transfer.

## Chapter 7 § 341 Meeting

72.     On February 3, 2016, the Debtor attended her Chapter 7 § 341 meeting.

73.     At the § 341 meeting, the Debtor was given by the Trustee a questionnaire which asked and instructed the Debtor to answer the following questions under oath and penalty of perjury to which the Debtor responded, "no":

  a.  Question No. 4: "Have you ever filed bankruptcy before this case?  If yes, where, when and what chapter?"

  b.  Question No. 5: "Is there anyone you may have owed money to on the date your case was filed who is <u>not</u> listed in your bankruptcy schedules?"

8

c. Question 6: "Is there anything that you owned or may have had a claim to ownership in on the date your case was filed that is <u>not</u> listed in you bankruptcy schedules?

d. Question 7: "Is there anything that you have or may have had an interest in, whether realized or not, on the date your case was filed that is <u>not</u> listed in your bankruptcy schedules?"

e. Question 9: "Did you acquire any property or any interest in any property within the <u>90 days</u> prior to the date your case was filed?"

f. Question 11: "Is there anything you own or have an interest in that is <u>not</u> in your possession?"

g. Question 12: "Does anyone owe you money or do you feel you may have a claim against anyone that is <u>not</u> listed in your bankruptcy schedules?"

h. Question 18: "Did you sell, give or otherwise transfer anything of value in excess of $1,000 to anyone within <u>four years</u> prior to the date your case was filed (except for trading in a car to a dealer)?"

i. Question 19: "Are you involved in a lawsuit, or do you feel that you have any basis for filing a lawsuit against anyone?"

74.     A copy of the Trustee's § 341 questionnaire filled out and signed by the Debtor under penalty of perjury is attached hereto as **EXHIBIT G.**

75.     The Product Liability Claim, the Civil Action, the Settlement Proceeds, the Properties, the contracts to purchase the Properties, the Leases, the right to receive rental income pursuant to the Leases, the Rental Income, the SCCU Account, the US Claims Transfer, and the Columbus County Down Payment Transfer were required to be disclosed at the § 341 meeting in response to the Trustee's questionnaire.

76.     On February 9, 2016, the Debtor filed an amended Schedule A/B and amended Schedule C-1.  The Product Liability Claim, the Civil Action, the Settlement Proceeds, the Properties, the contracts to purchase the Properties, the Leases, the right to receive rental income pursuant to the Leases, the Rental Income, the SCCU Account, the US Claims Transfer, and the Columbus County Down Payment Transfer were not disclosed in the Debtor's amended schedules.

77.     Based on the Debtor's representations in her Schedules, Statement of Financial Affairs and at the § 341 meeting as set forth above, the Trustee determined the case to be a "no asset case" and the Trustee filed a Report of No Distribution on February 11, 2016.

78.     On April 1, 2016 and within two months following the § 341 meeting, the Debtor faxed a letter and copies of the contracts to purchase the Properties to the Aylstock Firm requesting that Aylstock Firm send her the Settlement Proceeds "ASAP" to facilitate the

purchase of the Properties.   A copy of a letter dated April 1, 2016 from the Debtor to the Aylstock Firm requesting the Settlement Proceeds is attached hereto as **EXHIBIT H.**

79.    On April 6, 2016, the Court entered in this case the order discharging the Debtor.

80.    On April 7, 2016, the Court entered the final decree in and thereby closing this case.

81.    In November 2016, an attorney assisting the Aylstock Firm in managing its cases contacted the Trustee to inform him about the Civil Action and Settlement Proceeds and to inquire as to whether the bankruptcy estate had an interest in the Settlement Proceeds.

82.    Prior to November 2016, the Trustee was not aware of the Debtor's or the bankruptcy estate's interest in or the Debtor's failure to disclose the Product Liability Claim, the Civil Action, the Settlement Proceeds, the Properties, the contracts to purchase the Properties, the Leases, the right to receive rental income pursuant to the Leases, the Rental Income, the SCCU Account, the US Claims Transfer, and the Columbus County Down Payment Transfer.

83.    On November 28, 2016 the Trustee filed a motion for the Court to reopen this case in order to enable the Trustee to administer the Product Liability Claim as an asset of the estate, and on December 1, 2016 the Court entered an order reopening the case and reinstating the Trustee.

84.    On February 2, 2017, the Court entered an order directing the Debtor to attend a Bankruptcy Rule 2004 examination in order to enable the Trustee to examine the Debtor regarding the Product Liability Claim, the Civil Action, the Settlement Proceeds, the Properties, and any other matter related to the acts, conduct, property, and/or liabilities or financial condition of the Debtor or any matter which may affect the administration of the estate.

85.    The Debtor attended the 2004 examination which was held at the Trustee's office on February 24, 2017.   Aside from answering at the 2004 examination a few preliminary questions regarding the Debtor's name and other identification information, the Debtor answered each question by stating "I invoke my Fifth Amendment privilege against self-incrimination."

## FIRST CLAIM FOR RELIEF
### (Revocation of Discharge – 11 U.S.C. § 727(d)(1))

86.    The allegations set forth in paragraphs 1 through 85 above are realleged as if fully set forth herein.

87.    By failing to disclose and denying the existence of the Product Liability Claim, the Civil Action, the Settlement Program, the Settlement Proceeds, the Properties and the contracts to purchase the Properties, the Leases, the right to receive rental income pursuant to the Leases, the Rental Income, the US Claims Transfer, the Columbus County Down Payment Transfer, the SCCU Account and/or certain creditors, all as alleged above, (the "False Statements"), the Debtor made false statements in her Schedules and Statement of Financial Affairs which were signed under penalty of perjury and filed with the Bankruptcy Court, in the

10

Questionnaire signed under penalty of perjury and delivered to the Chapter 7 Trustee at the § 341 meeting, and in her sworn testimony at the § 341 meeting.

88.    The False Statements were false.

89.    The False Statements were made under oath and penalty of perjury.

90.    The Debtor knew the False Statements were false.

91.    The Debtor made the False Statements with a reckless disregard for the truth.

92.    The Debtor made the False Statements with fraudulent intent.

93.    The Debtor made the False Statements with the purpose and intent to deceive, and in fact, deceived the Trustee.

94.    The Debtor made the False Statements with the intent to hinder, delay, or defraud a creditor and/or the Trustee.

95.    The False Statements constitute false statements of material fact and false concealments of facts upon which the Debtor was under a duty to disclose.

96.    The False Statements constitute concealments of property of the Debtor within one year before the date of the filing of the petition.

97.    The False Statements constitute concealments of property of the estate after the date of the filing of the petition.

98.    The Trustee actually relied on the False Statements.  Specifically, if the Trustee had known of the Debtor's concealments or that the Debtor's statements were false he would have requested that the Debtor's discharge be denied.

99.    The Trustee's reliance on the False Statements was reasonable.

100.    The False Statements would have constituted grounds for denial of the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(4)(A).

101.    The False Statements and the Debtor's failure to disclose the property related to the False Statements would have constituted grounds for denial of the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(2).

102.    Subsequent to the granting of the discharge, in November 2016 when he was contacted by an attorney retained by the Aylstock Firm who informed the Trustee about the Civil Action and the Settlement Proceeds, the Trustee for the first time discovered that the False Statements were false.

103.    For the foregoing reasons, the Debtor's discharge has been obtained by fraud should be revoked pursuant to 11 U.S.C. § 727(d)(1).

## SECOND CLAIM FOR RELIEF
### (Revocation of Discharge – 11 U.S.C. § 727(d)(2))

104.    The allegations set forth in paragraphs 1 through 103 above are realleged as if fully set forth herein.

105.    The Product Liability Claim, the Civil Action, the Settlement Proceeds, the Properties, the SCCU Account, the Leases and/or the right to receive rental income pursuant to the Leases constitute interests in property of the bankruptcy estate.

106.    The Debtor concealed and maintained control of the Product Liability Claim, the Civil Action, the Settlement Proceeds, the Properties, the SCCU Account, the Leases and the right to receive rental income pursuant to the Leases from the Petition Date through approximately November 2016 when the Trustee initially discovered that the False Statements were false.

107.    The Debtor's concealment and maintenance of control over the Product Liability Claim, the Civil Action, the Settlement Proceeds, the Properties, the SCCU Account, the Leases, the right to receive rental income pursuant to the Leases, and the post-petition Rental Income constitute the Debtor's acquisition of property of the estate within the meaning of 11 U.S.C. § 727(d)(2).

108.    The Debtor knowingly and fraudulently failed to report to the Trustee her acquisition of and entitlement to the Product Liability Claim, the Civil Action, the Settlement Proceeds, the Properties, the SCCU Account, the Leases, the right to receive rental income pursuant to the Leases, and post-petition Rental Income.

109.    For the foregoing reasons, the Debtor's discharge should be revoked pursuant to 11 U.S.C. § 727(d)(2).

WHEREFORE, the Plaintiff requests that judgment be entered in his favor on behalf of the bankruptcy estate against the Defendant:

1.    Revoking the Debtor's discharge pursuant to 11 U.S.C. § 727(d)(1) and (d)(2);

2.    For the costs of this action; and

3.    For such other and further relief as the Court deems just and proper.

DATED:  March 28, 2017

BUTLER & BUTLER, L.L.P.

 s/ Hunter E. Fritz
Hunter E. Fritz
NC State Bar No. 46040
Attorneys for the Trustee
P.O. Box 38
Wilmington, North Carolina 28402
Telephone:  (910) 762-1908
Facsimile:   (910) 762-9441

EXHIBIT

A

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: ACTOS PRODUCTS LIABILITY LITIGATION | MDL No. 6:11-md-2299 |
| | JUDGE DOHERTY |
| RANDALL W. MYERS ; EDDIE W. WILLIAMS; CHESTER BAYLISS; MICHAEL MORRISON; JOHN A. HYTINEN LONNIE L. O'STEEN; DANIEL J. CAMPEAU; DOUGLAS HOLLIYAN; LEMMIE CHAPMAN; JOYCE ANN CAMPBELL; RITA A. BROOKS; DENNIE WAYNE GOSE; MCCOY CARAWAY; RAYMOND S. FRISCO; CARMEN FARIAS; ROGER LEE SHINGLETON; ARTHUR MARGOLIS; GARY W. LEWIS; GREGORY V. BRIGGS; and CLYDE DERRICOTT; | MAGISTRATE JUDGE HANNA  Civil Action No.: 6:14-cv-1166 |
| Plaintiffs, | |
| v. | |
| TAKEDA PHARMACEUTICALS USA, Inc. (f/k/a TAKEDA PHARMACEUTICALS NORTH AMERICA, Inc.), TAKEDA PHARMACEUTICALS AMERICA, Inc., TAKEDA GLOBAL RESEARCH & DEVELOPMENT CENTER, Inc., TAKEDA CALIFORNIA, Inc. (f/k/a TAKEDA SAN DIEGO, Inc.), and TAKEDA PHARMACEUTICALS INTERNATIONAL, Inc., TAKEDA PHARMACEUTICAL CO. LTD., and ELI LILLY & COMPANY, | BUNDLED COMPLAINT |
| Defendants | |

Plaintiffs by their attorneys, Aylstock, Witkin, Kreis & Overholtz, PLLC, hereby bring

this cause of action against Defendants TAKEDA PHARMACEUTICALS USA, Inc. (f/k/a

TAKEDA PHARMACEUTICALS NORTH AMERICA, Inc.), TAKEDA

PHARMACEUTICALS AMERICA, Inc., TAKEDA GLOBAL RESEARCH &

DEVELOPMENT CENTER, Inc., TAKEDA CALIFORNIA, Inc. (f/k/a TAKEDA SAN

DIEGO, Inc.), and TAKEDA PHARMACEUTICALS INTERNATIONAL, Inc., TAKEDA

PHARMACEUTICAL COMPANY LIMITED, and ELI LILLY & COMPANY ("Lilly" or

collectively with Takeda as "Defendants") and as for their Complaint allege, upon information

and belief and based on the investigation to date of counsel, as follows:

## NATURE OF THE CASE

1.      This is a personal injury action on behalf of plaintiffs against Defendants who

manufactured, sold and were responsible for the defective drug Actos (pioglitazone) and/or

Actosplus Met, Actosplus Met XR, Duetact (hereinafter "Actos").  Actos is a diabetes

medication used to improve blood sugar (glucose) control in adults such as plaintiffs with type II

diabetes that caused plaintiffs' bladder cancer.

## SUBJECT MATTER JURISDICTION AND VENUE GENERALLY

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because

the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because

complete diversity exists between the parties, as set forth below, Plaintiffs are citizens of states

that are different from the states where the Defendants are incorporated and have their principal

places of business.

3.      This Court has supplemental jurisdiction over the remaining common law and state

claims pursuant to 28 U.S.C. § 1367.

4.      Venue is proper within this District pursuant to 28 U.S.C. § 1391 because it is a

judicial district where Defendants are subject to personal jurisdiction in accordance with 28

U.S.C. § 1391(c).  Venue is also proper within this District pursuant to 28 U.S.C. § 1391 because it

is a judicial district where Defendants are subject to personal jurisdiction in accordance with 28

U.S.C. § 1391, and is subject to Multi-District Litigation proceedings within this District as part

of MDL No. 6:11-md-2299 as directed by this Court's First General Order dated January 23, 2012.

## PLAINTIFF SPECIFIC ALLEGATIONS

5.     Plaintiff, Randall W. Myers, alleges as follows:

   a.     Plaintiff is a natural person and citizen and resident of Michigan.

   b.     At all times relative, Plaintiff was a resident of Michigan.

   c.     Plaintiff Randall W. Myers ingested the prescription drug Actos as prescribed
          and directed by his physician and was injured and suffered bladder cancer as a
          result of his use of Actos.

   d.     Plaintiff Randall W. Myers was injured as a result of using Actos as prescribed,
          and therefore, seeks to recover damages.

6.     Plaintiff, Eddie W. Williams, alleges as follows:

   a.     Plaintiff is a natural person and a citizen and resident of Mississippi.

   b.     At all times relevant, Plaintiff was a resident of Mississippi.

   c.     Plaintiff Eddie W. Williams ingested the prescription drug Actos as prescribed
          and directed by his physician and was injured and suffered bladder cancer as a
          result of his use of Actos.

   d.     Plaintiff Eddie W. Williams was injured as a result of using Actos as prescribed,
          and therefore, seeks to recover damages.

7.     Plaintiff, Chester Bayliss, alleges as follows:

   a.     Plaintiff is a natural person and a citizen and resident of Wisconsin.

   b.     At all times relevant, Plaintiff was a resident of Wisconsin.

   c.     Plaintiff Chester Bayliss ingested the prescription drug Actos as

prescribed and directed by his physician and was injured and suffered bladder cancer as a result of his use of Actos.

    d.    Plaintiff Chester Bayliss was injured as a result of using Actos as prescribed, and therefore, seeks to recover damages.

8.    Plaintiff, Michael Morrison, alleges as follows:

    a.    Plaintiff is a natural person and a citizen and resident of Mississippi.

    b.    At all times relevant, Plaintiff was a resident of Mississippi.

    c.    Plaintiff Michael Morrison ingested the prescription drug Actos as prescribed and directed by his physician and was injured and suffered bladder cancer as a result of his use of Actos.

    d.    Plaintiff Michael Morrison was injured as a result of using Actos as prescribed, and therefore, seeks to recover damages.

9.    Plaintiff, John A. Hytinen, alleges as follows:

    a.    Plaintiff is a natural person and a citizen and resident of Michigan.

    b.    At all times relevant, Plaintiff was a resident of Michigan.

    c.    Plaintiff John A. Hytinen ingested the prescription drug Actos as prescribed and directed by his physician and was injured and suffered bladder cancer as a result of his use of Actos.

    d.    Plaintiff John A. Hytinen was injured as a result of using Actos as prescribed, and therefore, seeks to recover damages.

10.    Plaintiff, Lonnie L. O'Steen, alleges as follows:

    a.    Plaintiff is a natural person and a citizen and resident of Michigan.

    b.    At all times relevant, Plaintiff was a resident of Michigan.

     c.     Plaintiff Lonnie L. O'Steen ingested the prescription drug Actos as prescribed and directed by his physician and was injured and suffered bladder cancer as a result of his use of Actos.

     d.     Plaintiff Lonnie L. O'Steen was injured as a result of using Actos as prescribed, and therefore, seeks to recover damages.

11.     Plaintiff, Daniel J. Campeau, alleges as follows:

     a.     Plaintiff is a natural person and a citizen and resident of Wisconsin.

     b.     At all times relevant, Plaintiff was a resident of Wisconsin.

     c.     Plaintiff Daniel J. Campeau ingested the prescription drug Actos as prescribed and directed by his physician and was injured and suffered bladder cancer as a result of his use of Actos.

     d.     Plaintiff Daniel J. Campeau was injured as a result of using Actos as prescribed, and therefore, seeks to recover damages.

12.     Plaintiff, Douglas Holliyan, alleges as follows:

     a.     Plaintiff is a natural person and a citizen and resident of Alabama.

     b.     At all times relevant, Plaintiff was a resident of Alabama.

     c.     Plaintiff Douglas Holliyan ingested the prescription drug Actos as prescribed and directed by his physician and was injured and suffered bladder cancer as a result of his use of Actos.

     d.     Plaintiff Douglas Holliyan was injured as a result of using Actos as prescribed, and therefore, seeks to recover damages.

13.     Plaintiff, Lemmie Chapman, alleges as follows:

     a.     Plaintiff is a natural person and a citizen and resident of Louisiana.

    b.     At all times relevant, Plaintiff was a resident of Louisiana.

    c.     Plaintiff Lemmie Chapman ingested the prescription drug Actos as prescribed and directed by his physician and was injured and suffered bladder cancer as a result of his use of Actos.

    d.     Plaintiff Lemmie Chapman was injured as a result of using Actos as prescribed, and therefore, seeks to recover damages.

14.    Plaintiff, Joyce Ann Campbell, alleges as follows:

    a.     Plaintiff is a natural person and a citizen and resident of North Carolina.

    b.     At all times relevant, Plaintiff was a resident of North Carolina.

    c.     Plaintiff Joyce Ann Campbell ingested the prescription drug Actos as prescribed and directed by her physician and was injured and suffered bladder cancer as a result of her use of Actos.

    d.     Plaintiff Joyce Ann Campbell was injured as a result of using Actos as prescribed, and therefore, seeks to recover damages.

15.    Plaintiff, Rita A. Brooks, alleges as follows:

    a.     Plaintiff is a natural person and a citizen and resident of Maryland.

    b.     At all times relevant, Plaintiff was a resident of Maryland.

    c.     Plaintiff Rita A. Brooks ingested the prescription drug Actos as prescribed and directed by her physician and was injured and suffered bladder cancer as a result of her use of Actos.

    d.     Plaintiff Rita A. Brooks was injured as a result of using Actos as prescribed, and therefore, seeks to recover damages.

16.    Plaintiff, Dennie Wayne Gose, alleges as follows:

a. Plaintiff is a natural person and a citizen and resident of New Mexico.

b. At all times relevant, Plaintiff was a resident of New Mexico.

c. Plaintiff Dennie Wayne Gose ingested the prescription drug Actos as prescribed and directed by his physician and was injured and suffered bladder cancer as a result of his use of Actos.

d. Plaintiff Dennie Wayne Gose was injured as a result of using Actos as prescribed, and therefore, seeks to recover damages.

17. Plaintiff, McCoy Caraway, alleges as follows:

a. Plaintiff is a natural person and a citizen and resident of Kansas.

b. At all times relevant, Plaintiff was a resident of Kansas.

c. Plaintiff McCoy Caraway ingested the prescription drug Actos as prescribed and directed by his physician and was injured and suffered bladder cancer as a result of his use of Actos.

d. Plaintiff McCoy Caraway was injured as a result of using Actos as prescribed, and therefore, seeks to recover damages.

18. Plaintiff, Raymond S. Frisco, alleges as follows:

a. Plaintiff is a natural person and a citizen and resident of Florida.

b. At all times relevant, Plaintiff was a resident of Florida.

c. Plaintiff Raymond S. Frisco ingested the prescription drug Actos as prescribed and directed by his physician and was injured and suffered bladder cancer as a result of his use of Actos.

d. Plaintiff Raymond S. Frisco was injured as a result of using Actos as prescribed, and therefore, seeks to recover damages.

19. Plaintiff, Carmen Farias, alleges as follows:

    a.       Plaintiff is a natural person and a citizen and resident of Florida.

    b.       At all times relevant, Plaintiff was a resident of Florida.

    c.       Plaintiff Carmen Farias ingested the prescription drug Actos as prescribed and directed by her physician and was injured and suffered bladder cancer as a result of her use of Actos.

    d.       Plaintiff Carmen Farias was injured as a result of using Actos as prescribed, and therefore, seeks to recover damages.

20. Plaintiff, Roger Lee Shingleton, alleges as follows:

    a.       Plaintiff is a natural person and a citizen and resident of Florida.

    b.       At all times relevant, Plaintiff was a resident of Florida.

    c.       Plaintiff Roger Lee Shingleton ingested the prescription drug Actos as prescribed and directed by his physician and was injured and suffered bladder cancer as a result of his use of Actos.

    d.       Plaintiff Roger Lee Shingleton was injured as a result of using Actos as prescribed, and therefore, seeks to recover damages.

21. Plaintiff, Arthur Margolis, alleges as follows:

    a.       Plaintiff is a natural person and a citizen and resident of Florida.

    b.       At all times relevant, Plaintiff was a resident of Florida.

    c.       Plaintiff Arthur Margolis ingested the prescription drug Actos as prescribed and directed by his physician and was injured and suffered bladder cancer as a result of his use of Actos.

    d.      Plaintiff Arthur Margolis was injured as a result of using Actos as prescribed, and therefore, seeks to recover damages.

22.    Plaintiff, Gary W. Lewis, alleges as follows:

    a.      Plaintiff is a natural person and a citizen and resident of Ohio.

    b.      At all times relevant, Plaintiff was a resident of Ohio.

    c.      Plaintiff Gary W. Lewis ingested the prescription drug Actos as prescribed and directed by his physician and was injured and suffered bladder cancer as a result of his use of Actos.

    d.      Plaintiff Gary W. Lewis was injured as a result of using Actos as prescribed, and therefore, seeks to recover damages.

23.    Plaintiff, Gregory V. Briggs, alleges as follows:

    a.      Plaintiff is a natural person and a citizen and resident of Ohio.

    b.      At all times relevant, Plaintiff was a resident of Ohio.

    c.      Plaintiff Gregory V. Briggs ingested the prescription drug Actos as prescribed and directed by his physician and was injured and suffered bladder cancer as a result of his use of Actos.

    d.      Plaintiff Gregory V. Briggs was injured as a result of using Actos as prescribed, and therefore, seeks to recover damages.

24.    Plaintiff, Clyde Derricott, alleges as follows:

    a.      Plaintiff is a natural person and a citizen and resident of Virginia.

    b.      At all times relevant, Plaintiff was a resident of Virginia.

    c.      Plaintiff Clyde Derricott ingested the prescription drug Actos as prescribed

and directed by his physician and was injured and suffered bladder cancer as a result of his use of Actos.

      d.     Plaintiff Clyde Derricott was injured as a result of using Actos as prescribed, and therefore, seeks to recover damages.

## PARTY DEFENDANTS AND PERSONAL JURISDICTION

25.    Upon information and belief, Takeda Pharmaceuticals America, Inc., is a Delaware corporation with its principal place of business at One Takeda Parkway, Deerfield, Illinois 60015.  Takeda Pharmaceuticals America, Inc., is a wholly-owned subsidiary of Takeda Pharmaceuticals U.S.A., Inc., and is involved in the research, development, manufacturing, sales, and marketing of Actos and pioglitazone hydrochloride.

26.    Upon information and belief, Takeda Pharmaceuticals U.S.A., Inc. (formerly known as Takeda Pharmaceuticals North America, Inc.), is a Delaware corporation with its principal place of business at One Takeda Parkway, Deerfield, Illinois 60015. Takeda Pharmaceuticals U.S.A., Inc., is involved in the research, development, manufacturing, sales, and marketing of Actos and pioglitazone hydrochloride.

27.    Upon information and belief, Takeda Global Research & Development Center, Inc., is an Illinois corporation with its principal place of business at One Takeda Parkway, Deerfield, Illinois 60015.  Takeda Global Research & Development Center, Inc., is involved in the research, development, manufacturing, sales, and marketing of Actos and pioglitazone hydrochloride.

28.    Upon information and belief, Takeda California, Inc. (formerly known as Takeda San Diego, Inc.), is a Delaware corporation with its principal place of business at 10410 Science Center Drive, San Diego, California 92121. Takeda California, Inc., is the entity resulting from

the merger of Takeda San Diego, Inc., and Takeda San Francisco, Inc. Takeda California, Inc., is involved in the research, development, manufacturing, sales and marketing of Actos and pioglitazone hydrochloride.

29.     Upon information and belief, Takeda Pharmaceuticals International, Inc., is an Illinois corporation with its principal place of business at One Takeda Parkway, Deerfield, Illinois 60015. Takeda Pharmaceuticals International, Inc., is involved in the research, development, manufacturing, sales and marketing of Actos and pioglitazone hydrochloride.

30.     Upon information and belief, Takeda Pharmaceutical Company Limited is a foreign corporation with its principal place of business located at 1-1 Doshomachi 4-chome, Chuo-Ku Osaka, 540-8645, Japan. Takeda Pharmaceutical Company Limited is the parent/holding company of Takeda Pharmaceuticals International, Inc., Takeda Pharmaceuticals U.S.A., Inc., Takeda Global Research & Development Center Inc., and Takeda California, Inc. Takeda Pharmaceutical Company Limited is involved in the research, development, manufacturing, sales and marketing of Actos and pioglitazone hydrochloride.

31.     Upon information and belief, and at all relevant times, Takeda Pharmaceutical Company Limited exercised and exercises dominion and control over Defendants Takeda Pharmaceuticals International, Inc., Takeda Pharmaceuticals U.S.A., Inc., Takeda Global Research & Development Center Inc., Takeda Pharmaceuticals America, Inc., and Takeda California, Inc.

32.     Defendant ELI LILLY AND COMPANY is an Indiana corporation, having a principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285. As part of its business ELI LILLY AND COMPANY is involved in the research, development, sales and marketing of pharmaceutical products including Actos and pioglitazone hydrochloride.

33.     Upon information and belief, at relevant times, Defendants were engaged in the

business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce in various states, including the States of Alabama, Florida, Kansas, Louisiana, Maryland, Michigan, Mississippi, New Mexico, North Carolina, Ohio, Virginia and Wisconsin, and throughout the United States, either directly or indirectly through third parties or related entities, its products, including Actos and pioglitazone hydrochloride.

34.    At relevant times, Defendants conducted regular and sustained business and engaged in substantial commerce and business activity in various states, including the States of Alabama, Florida, Kansas, Louisiana, Maryland, Michigan, Mississippi, New Mexico, North Carolina, Ohio, Virginia and Wisconsin, and throughout the United States, which included but was not limited to selling, marketing and distributing its products including Actos and pioglitazone hydrochloride in various states, including the States of Alabama, Florida, Kansas, Louisiana, Maryland, Michigan, Mississippi, New Mexico, North Carolina, Ohio, Virginia and Wisconsin, and throughout the United States

35.    Upon information and belief, at all relevant times, Defendants expected or should have expected that their acts would have consequences within the United States of America including the States of Alabama, Florida, Kansas, Louisiana, Maryland, Michigan, Mississippi, New Mexico, North Carolina, Ohio, Virginia and Wisconsin; and Defendants derived and derive substantial revenue from interstate commerce.

36.    Upon information and belief, Defendant, TAKEDA PHARMACEUTICAL COMPANY LIMITED, is a company domiciled in Japan and is the parent/holding company of Defendants, TAKEDA PHARMACEUTICALS INTERNATIONAL INC., TAKEDA PHARMACEUTICALS U.S.A. INC., TAKEDA PHARMACEUTICALS LLC., TAKEDA

GLOBAL RESEARCH & DEVELOPMENT CENTER INC., and TAKEDA CALIFORNIA INC.

37.     Upon information and belief, at all relevant times, Defendant, TAKEDA PHARMACEUTICAL COMPANY LIMITED, exercised and exercises dominion and control over Defendants, TAKEDA PHARMACEUTICALS INTERNATIONAL INC., TAKEDA PHARMACEUTICALS U.S.A. INC., TAKEDA PHARMACEUTICALS LLC., TAKEDA GLOBAL RESEARCH & DEVELOPMENT CENTER INC., and TAKEDA CALIFORNIA INC.

38.     Upon information and belief, at all relevant times, Defendant, TAKEDA PHARMACEUTICAL COMPANY LIMITED, expected or should have expected that its acts would have consequences within the United States of America and the States of Alabama, Florida, Kansas, Louisiana, Maryland, Michigan, Mississippi, New Mexico, North Carolina, Ohio, Virginia and Wisconsin, and derived and derive substantial revenue from interstate commerce.

39.     Upon information and belief, at all relevant times, Defendants, including Defendant, TAKEDA PHARMACEUTICAL COMPANY LIMITED, have transacted and conducted business in the States of Alabama, Florida, Kansas, Louisiana, Maryland, Michigan, Mississippi, New Mexico, North Carolina, Ohio, Virginia and Wisconsin, and/or contracted to supply goods and services within the States of Alabama, Florida, Kansas, Louisiana, Maryland, Michigan, Mississippi, New Mexico, North Carolina, Ohio, Virginia and Wisconsin, and these causes of action have arisen from same.

40.     Upon information and belief, at all relevant times, Defendants, including Defendant, TAKEDA PHARMACEUTICAL COMPANY LIMITED, committed a tortious act

within the States of New Jersey, West Virginia and Mississippi, causing injury within the States

of Alabama, Florida, Kansas, Louisiana, Maryland, Michigan, Mississippi, New Mexico, North

Carolina, Ohio, Virginia and Wisconsin, out of which act(s) these causes of action arise.

41.    Upon information and belief, at all relevant times, Defendants, including Defendant,

TAKEDA PHARMACEUTICAL COMPANY LIMITED, committed tortious act(s) within the

States of Alabama, Florida, Kansas, Louisiana, Maryland, Michigan, Mississippi, New Mexico,

North Carolina, Ohio, Virginia and Wisconsin, out of which act(s) these causes of action arise.

42.    Upon information and belief, at all relevant times, Defendant ELI LILLY AND

COMPANY expected or should have expected that its acts would have consequences within the

United States of America and the States of Alabama, Florida, Kansas, Louisiana, Maryland,

Michigan, Mississippi, New Mexico, North Carolina, Ohio, Virginia and Wisconsin, and derived

and derive substantial revenue from interstate commerce.

43.    Upon information and belief, at all relevant times, Defendants, including Defendant ELI

LILLY AND COMPANY have transacted and conducted business in the States of Alabama,

Florida, Kansas, Louisiana, Maryland, Michigan, Mississippi, New Mexico, North Carolina,

Ohio, Virginia and Wisconsin, and/or contracted to supply goods and services within the States

of Alabama, Florida, Kansas, Louisiana, Maryland, Michigan, Mississippi, New Mexico, North

Carolina, Ohio, Virginia and Wisconsin; and these causes of action have arisen from same.

44.    Upon information and belief, at all relevant times, Defendants, including Defendant ELI

LILLY AND COMPANY committed a tortious act without the States of Alabama, Florida,

Kansas, Louisiana, Maryland, Michigan, Mississippi, New Mexico, North Carolina, Ohio,

Virginia and Wisconsin, causing injury within the States Alabama, Florida, Kansas, Louisiana,

Maryland, Michigan, Mississippi, New Mexico, North Carolina, Ohio, Virginia and Wisconsin, out of which act(s) these causes of action arise.

45.     Upon information and belief, at all relevant times, Defendants, including Defendant ELI LILLY AND COMPANY committed tortious act(s) within the States of Alabama, Florida, Kansas, Louisiana, Maryland, Michigan, Mississippi, New Mexico, North Carolina, Ohio, Virginia and Wisconsin, out of which act(s) these causes of action arise.

## FACTUAL BACKGROUND

46.     At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Actos and pioglitazone hydrochloride for treatment of Type 2 Diabetes Mellitus.

47.     Actos received FDA approval in 1999 to treat Type 2 Diabetes Mellitus.

48.     Actos was jointly launched by Takeda North America and Lilly in 1999.

49.     On April 20, 2006, Takeda Limited announced the conclusion of its collaboration in the United States between Takeda North America and Lilly to promote and market Actos, a partnership Takeda Limited described as "a great success" and "mutually beneficial to both companies."

50.     Prior to applying for and obtaining approval for Actos, Defendants knew or should have known that Actos use in humans was associated with and/or would cause the induction of bladder cancer and Defendants possessed pre-clinical scientific studies including animal evidence, which evidence Defendants knew or should have known was a signal that bladder cancer risk needed to be further tested and studied before placing Actos on the market.

51.     Despite bladder cancer findings in animal model carcinogenicity studies and other pre-clinical evidence, Defendants failed to adequately conduct complete and proper testing of

Actos prior to filing its New Drug Application of Actos.

52.    It is now known that additional bladder cancer evidence from human clinical trials also became known to Defendants in the early 2000's.

53.    From the date of approval to market Actos, Defendants made, distributed, marketed and sold Actos without adequate warning to Plaintiffs' prescribing physicians, or Plaintiffs, that Actos was associated with and/or could cause bladder cancer and presented a risk of bladder cancer in patients who used it and without adequate warning that Defendants had not adequately conducted complete and proper testing and studies of Actos with regard to carcinogenicity.

54.    For over 10 years and to date, Defendants concealed and failed to completely disclose its knowledge that Actos was associated with or could cause bladder cancer or its knowledge that it had failed to fully study and test regarding that risk.

55.    Defendants' failure to disclose information that they possessed regarding the failure to adequately study and test Actos for bladder cancer risk further rendered warnings for this medication inadequate.

56.    Upon information and belief, Defendants ignored the association between the use of Actos and pioglitazone hydrochloride and the risk of developing bladder cancer.

57.    On June 7, 2011, the Caisse nationale de l'assurance maladie, at the request of the French regulatory agency, published a report concluding that there is a statistically significant association between exposure to pioglitazone (Actos) and bladder cancer and that the risk increased with exposure longer than one year.

58.    On June 9, 2011, the European Medicine Agency suspended the use of Actos in light of the French Marketing Authorization Committee and the French National

Pharmacovigilance Committee's findings regarding the increased risk of bladder cancer.

59.     On June 10, 2011, Germany's Federal Institute for Drugs and Medical Devices suspended the use of Actos.

60.     On June 15, 2011, the FDA informed the public that use of the diabetes medication Actos for more than one year may be associated with an increased risk of bladder cancer. The Actos label was then changed to reflect this information in the Warnings and Precautions section as well as the patient Medication Guide to include information regarding the risk of bladder cancer.

61.     FDA further recommended on June 15, 2011, that healthcare physicians discontinue pioglitazone use in patients with active bladder cancer.

62.     On June 17, 2011, Health Canada Press Release indicated that in light of studies suggesting an increased risk of bladder cancer with the diabetes drug pioglitazone, as well as actions taken by other regulatory agencies, Health Canada informed healthcare professionals and Canadians that it is undertaking a review of the drug's status.

63.     As a result of using Defendants' Actos, Plaintiffs were caused to suffer bodily injury including cancerous tumor(s) in their bladder and were thus caused to sustain severe and permanent personal injuries, pain, suffering, mental anguish and fear of recurrence and death.

64.     The injuries and damages sustained by Plaintiffs were caused or substantially contributed to by Defendants' Actos and the Defendants' wrongful conduct.

65.     The product warnings for Actos in effect during the time period Plaintiffs used Actos were vague, incomplete or otherwise inadequate, both substantively and graphically, to alert prescribing physicians as well as Plaintiffs of the bladder cancer risk associated with this drug.

66.     Defendants did not provide adequate warnings to Plaintiffs' doctors, Plaintiffs, the

health care community and the general public about the increased risk of serious adverse events that are described herein.

67.     Had Plaintiffs' physicians and Plaintiffs been adequately warned of the potential life-threatening side effects of the Defendants' Actos, Plaintiffs' physicians would have changed the manner in which they prescribed Actos, including but not limited to, passing on the risks to the Plaintiffs and discussing the risks with Plaintiffs; Plaintiffs would not have purchased or taken Actos and would have chosen to request other treatments or prescription medications had they been informed of the risks of Actos.

68.     By reason of the foregoing, Plaintiffs developed serious and dangerous side effects including bladder cancer, as well as other severe and personal injuries, physical pain and mental anguish, including diminished enjoyment of life, a risk of future cancer(s), reasonable fear of future cancer, any and all life complications caused by Plaintiffs' bladder cancer, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above and other named health consequences.

## EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

69.     The running of any statute of limitation has been tolled by reason of Defendants' conduct. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiffs and Plaintiffs' prescribing physicians the true risks associated with Actos and pioglitazone hydrochloride.

70.     As a result of Defendants' actions, Plaintiffs and Plaintiffs' prescribing physicians were unaware, and could not reasonably know or have learned through reasonable diligence that Plaintiffs had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

71.     Furthermore, Defendants are estopped from relying on any statute of limitations because of their concealment of the truth, quality and nature of Actos and pioglitazone hydrochloride. Defendants were under a duty to disclose the true character, quality and nature of Actos because this was non-public information which the Defendants had and continue to have exclusive control, and because the Defendants knew that this information was not available to Plaintiffs, their medical providers and/or to their health facilities.

72.     Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing and promoting a profitable drug, notwithstanding the known or reasonably known risks. Plaintiffs and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and were forced to rely on Defendants' representations.

### FIRST CAUSE OF ACTION
### AS AGAINST DEFENDANTS
### (NEGLIGENCE)

73.     Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

74.     Defendants had a duty to Plaintiffs to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale and/or distribution of Actos and pioglitazone hydrochloride into the stream of commerce, including a duty to assure that Actos and pioglitazone hydrochloride would not cause users to suffer unreasonable, dangerous side effects such as cancer.

75.     Defendants failed to exercise ordinary care and/or were reckless in designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Actos into interstate commerce in that

Defendants knew or should have known that using Actos caused a risk of unreasonable, dangerous side effects, including bladder cancer and death.

76.     Despite the fact that Defendants knew or should have known that Actos was associated with and/or caused bladder cancer, Defendants continued to market, manufacture, distribute and/or sell Actos to consumers, including the Plaintiffs.

77.     Defendants knew or should have known that consumers such as the Plaintiffs would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

78.     Defendants' negligence and/or recklessness were the legal and proximate cause of Plaintiffs' injuries, harm and economic loss which each suffered.

79.     As a result Defendants' negligence and/or recklessness, Plaintiffs were caused to suffer serious and dangerous side effects including bladder cancer, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, fear of recurrence of cancer and death, as well as surgical procedures, medical treatment, and monitoring and/or medications.

80.     As a result of the foregoing acts and omissions Plaintiffs required health care and services and did incur medical, health, incidental and related expenses.

81.     By reason of the foregoing, Plaintiffs demand judgment against each Defendant, individually, jointly and severally for compensatory damages in a sum in excess of $75,000 and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## AS AGAINST DEFENDANTS
## (STRICT PRODUCTS LIABILITY - FAILURE TO WARN)

82.     Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint
with the same force and effect as if more fully set forth herein.

83.     Defendants researched, tested, developed, designed, licensed, manufactured,
packaged, labeled, distributed, sold, marketed, and/or introduced Actos into the stream of
commerce, and in the course of same, directly advertised or marketed Actos and pioglitazone
hydrochloride to consumers or persons responsible for consumers, and therefore, had a duty to
both Plaintiffs directly and Plaintiffs' physician to warn of risks associated with the use of the
product.

84.     Defendants had a duty to warn of adverse drug reactions, which they know or
have reason to know can be caused by the use of Actos and pioglitazone hydrochloride and/or
are associated with the use of Actos and pioglitazone hydrochloride.

85.     The Actos and pioglitazone hydrochloride manufactured and/or supplied by
Defendants was defective due to inadequate post-marketing warnings and/or instructions
because, after Defendants knew or should have known of the risks of bladder cancer from Actos
use, they failed to provide adequate warnings to consumers of the product, including Plaintiffs
and Plaintiffs' physicians, and continued to aggressively promote Actos.

86.     Due to the inadequate warning regarding bladder cancer, Actos was in a defective
condition and unreasonably dangerous at the time that it left the control of Defendants.

87.     Defendants failed to adequately warn Plaintiffs and Plaintiffs' prescribing
physicians of human and animal results in preclinical studies pertaining to bladder cancer and
Actos.

88. Defendants' failure to adequately warn Plaintiffs and Plaintiffs' prescribing physicians of a bladder cancer risk prevented Plaintiffs' prescribing physicians and Plaintiffs from correctly and fully evaluating the risks and benefits of Actos and pioglitazone hydrochloride.

89. Had Plaintiffs' physicians and Plaintiffs been adequately warned of the potential life-threatening side effects of the Defendants' Actos, Plaintiffs' physicians would have changed the manner in which they prescribed Actos, including but not limited to, passing on the risks to the Plaintiffs and discussing the risks with Plaintiffs; Plaintiffs would not have purchased or taken Actos and would have chosen to request other treatments or prescription medications had he been informed of the risks of Actos.

90. Upon information and belief, had Plaintiffs' prescribing physicians been adequately warned of the potential life-threatening side effects of Defendants' Actos and pioglitazone hydrochloride, Plaintiffs' prescribing physicians would have discussed the risks of bladder cancer and death associated with Actos with Plaintiffs and/or would not have prescribed it to Plaintiffs.

91. As a foreseeable and proximate result of the aforementioned wrongful acts and omissions of Defendants, Plaintiffs were caused to suffer from the aforementioned injuries and damages.

92. By reason of the foregoing, Plaintiffs demand judgment against each Defendant, individually, jointly and severally for compensatory damages in a sum in excess of $75,000 and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as the Court deems proper.

### THIRD CAUSE OF ACTION
### AS AGAINST DEFENDANTS
### (STRICT PRODUCTS LIABILITY - DEFECTIVE DESIGN)

93.     Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint

with the same force and effect as if more fully set forth herein.

94.     Actos was expected to, and did, reach the intended consumers, handlers, and

persons coming into contact with the product without substantial change in the condition in

which it was produced, manufactured, sold, distributed, labeled, and marketed by Defendants.

95.     At all times relevant, Actos was manufactured, designed, and labeled in an unsafe,

defective, and inherently dangerous condition, which was dangerous for use by the public, and,

in particular, by Plaintiffs.

96.     Actos and pioglitazone hydrochloride as researched, tested, developed, designed,

licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants was

defective in design and formulation in that when it left the hands of the manufacturers and/or

suppliers the foreseeable risks exceeded the alleged benefits associated with the design and

formulation of Actos.

97.     Actos and pioglitazone hydrochloride as researched, tested, developed, designed,

licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants was

defective in design and formulation, because when it left the hands of Defendants' manufacturers

and suppliers it was unreasonably dangerous and was also more dangerous than the ordinary

consumer would expect.

98.     At all times herein mentioned, Actos and pioglitazone hydrochloride was in a

defective condition and was unsafe, and Defendants knew and had reason to know that the

product was defective and inherently unsafe, especially when Actos was used in a form and

manner instructed and provided by Defendants.

99.     Defendants had a duty to create a product that was not unreasonably dangerous for its normal, common, intended use.

100.    At the time of Plaintiffs' use of Actos, it was being used for its intended purpose, and in a manner normally intended, namely for the treatment of Type 2 Diabetes Mellitus.

101.    Defendants researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed a defective product that caused an unreasonable risk to the health of consumers, and to Plaintiffs in particular, and Defendants are therefore strictly liable for the injuries and damages sustained by Plaintiffs.

102.    At the time Defendants' product left their control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Actos. This was demonstrated by the existence of other Type 2 Diabetes Mellitus medications which had a more established safety profile and a considerably lower risk profile.

103.    Plaintiffs could not, by the reasonable exercise of care, have discovered Actos' defects and perceived its danger.

104.    The defects in Defendants' product were substantial and contributing factors in causing Plaintiff's injuries.

105.    As a foreseeable, direct, legal, and proximate result of the aforementioned wrongful acts and omissions of Defendants, Plaintiffs were caused to suffer from the aforementioned injuries and damages.

106.    Due to the unreasonably dangerous condition of Actos, Defendants are strictly liable to Plaintiffs.

107.    By reason of the foregoing, Plaintiffs demand judgment against each Defendant,

individually, jointly and severally for compensatory damages in a sum in excess of $75,000 and

punitive damages, together with interest, costs of suit, attorneys' fees and all such other and

further relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## AS AGAINST DEFENDANTS
## (BREACH OF EXPRESS WARRANTY)

108.    Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint

with the same force and effect as if more fully set forth herein.

109.    Defendants expressly warranted that Actos was safe for its intended use and as

otherwise described in this complaint. Actos did not conform to these express representations,

including, but not limited to, the representation that it was well accepted in patient and animal

studies, the representation that it was safe, and the representation that it did not have high and/or

unacceptable levels of life-threatening side effects like bladder cancer, that it would improve

health, maintain health, and potentially prolong life.

110.    The express warranties represented by Defendants were a part of the basis for

Plaintiffs' use of Actos and Plaintiffs relied on these warranties in deciding to use Actos.

111.    At the time of the making of the express warranties, Defendants had knowledge of

the purpose for which the Actos and pioglitazone hydrochloride was to be used, and warranted

same to be in all respects safe, effective and proper for such purpose.

112.    Actos does not conform to these express representations because Actos is not safe

or effective and may produce serious side effects, including among other things bladder cancer,

degrading Plaintiffs' health, and shrinking their life expectancy.

113.    As a result of the foregoing breach of express warranty, Plaintiffs were caused to

suffer bladder cancer, as well as other severe and personal injuries, which were permanent and lasting in nature including metastatic cancer, physical pain and mental anguish, including diminished enjoyment of life, fear of recurrence of cancer and death, as well as surgical procedures, medical treatment, monitoring and/or medications.

114. By reason of the foregoing, Plaintiffs were severely and permanently injured, and required constant and continuous medical monitoring and treatment after their use of Defendants' Actos drug.

115. As a result of the foregoing acts and omissions, Plaintiffs required more health care and services and did incur medical, health, incidental and related expenses.

116. By reason of the foregoing, Plaintiffs demand judgment against each Defendant, individually, jointly and severally for compensatory damages in a sum in excess of $75,000 and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as the Court deems proper.

### FIFTH CAUSE OF ACTION
### AS AGAINST DEFENDANTS
### (BREACH OF IMPLIED WARRANTY
### FOR A PARTICULAR PURPOSE)

117. Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

118. At all times herein mentioned, Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Actos and pioglitazone hydrochloride, to treat Type 2 Diabetes Mellitus.

119. Defendants impliedly represented and warranted to the users of Actos that Actos was safe and fit for the particular purpose for which said product was to be used, namely treating diabetes, improving health, maintaining health, and potentially prolonging life.

120.     These representations and warranties aforementioned were false, misleading, and inaccurate in that Actos and pioglitazone hydrochloride were unsafe, degraded Plaintiffs' health and shortened their life expectancy.

121.     Plaintiffs relied on the implied warranty of fitness for a particular use and purpose.

122.     Plaintiffs reasonably relied upon the skill and judgment of Defendants as to whether Actos was safe and fit for its intended use.

123.     Actos and pioglitazone hydrochloride were injected into the stream of commerce by Defendants in a defective, unsafe, and inherently dangerous condition and the products and materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

124.     Defendants breached the aforesaid implied warranty, as their drug Actos was not fit for its intended purposes and uses.

125.     As a result of the foregoing breach of warranty, Plaintiffs were caused to suffer serious and dangerous side effects including bladder cancer, as well as other severe and personal injuries which were permanent and lasting in nature, including metastatic cancer, physical pain and mental anguish, including diminished enjoyment of life, fear of recurrence of cancer and death, as well as surgical procedures, medical treatment, and monitoring and/or medications.

126.     As a result of the foregoing acts and omissions Plaintiffs required more health care and services and did incur medical, health, incidental and related expenses.

127.     By reason of the foregoing, Plaintiffs demand judgment against each Defendant, individually, jointly and severally for compensatory damages in a sum in excess of $75,000 and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as the Court deems proper.

## SIXTH CAUSE OF ACTION AS
## AGAINST DEFENDANTS
## (BREACH OF IMPLIED WARRANTY
## OF MERCHANTABILITY)

128.    Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

129.    Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Actos and pioglitazone hydrochloride, to treat Type 2 Diabetes Mellitus.

130.    Defendants marketed, sold and distributed Actos and knew and promoted the use for which Actos was being used by Plaintiffs and impliedly warranted to Plaintiffs that Actos was of merchantable quality and fit for the ordinary purpose for which it was intended, namely treating diabetes, improving health, maintaining health, and potentially prolonging life.

131.    These representations and warranties aforementioned were false, misleading, and inaccurate in that Actos and pioglitazone hydrochloride were unsafe, degraded Plaintiffs' health and shortened their life expectancy.

132.    Plaintiffs reasonably relied on the skill, expertise and judgment of Defendants and its representations as to the fact that Actos was of merchantable quality.

133.    The Actos and pioglitazone hydrochloride manufactured and supplied by Defendants was not of merchantable quality, as warranted by Defendants in that the drug had dangerous and life threatening side effects and was thus not fit for the ordinary purpose for which it was intended.

134.    As a direct and proximate result of the foregoing, Plaintiffs were caused bodily injury, pain and suffering and economic loss.

135.    As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects including bladder cancer, as well as other severe and personal

injuries which are permanent and lasting in nature, including metastatic cancer, physical pain and mental anguish, including diminished enjoyment of life, fear of recurrence of cancer and death, as well as surgical procedures, medical treatment, and monitoring and/or medications.

136.    As a result of the foregoing acts and omissions Plaintiffs required more health care and services and did incur medical, health, incidental and related expenses.

137.    By reason of the foregoing, Plaintiffs demand judgment against each Defendant, individually, jointly and severally for compensatory damages in a sum in excess of $75,000 and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as the Court deems proper.

138.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages in a sum that exceeds the jurisdictional limits of all lower courts that might otherwise have jurisdiction.

### SEVENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS (FRAUD AND FRAUDULENT CONCEALMENT)

139.    Plaintiffs reallege and repeat those paragraphs above as if set forth fully herein.

140.    Defendants made material representations and material omissions and/or concealments to Plaintiff, his treating physicians, to the medical and healthcare community at large, and to the general public regarding the safety and/or efficacy of Actos.

141.    Defendants made material representations by using written or verbal communications, advertisements, drug packaging and labeling, and/or statements made by Defendants' agents. These representations were intended to promote and/or support Actos, including, but not limited to, representations of the following effect:

> a. That Actos is a safe and effective drug for use in Type 2 Diabetics;

b. That Actos was a safer and more effective drug than other Type 2 Diabetes drugs or treatments;

c. That Actos has significant or superior health benefits, especially as compared to other drugs, including but not limited to, superior lipid profile benefits, superior organ and tissue benefits, superior blood sugar control, and/or significant reduced risk for heart-related adverse events;

d. That Actos had a favorable safety profile, and had fewer adverse health and side effects than were known or should have been known by Defendants;

e. That Actos poses no statistically significant risk of cancer to the urinary tract and/or bladder in humans.

142. Defendants made these material representations, which also included omissions of material fact, to the medical and healthcare community at large, the general public, to Plaintiffs' medical or healthcare provider(s), and/or to Plaintiffs with intent to induce medical and healthcare providers and Type 2 Diabetes patients to dispense, provide, prescribe, accept, purchase, and/or consume the drug for treatment of Type 2 Diabetes. Specifically, but not exhaustively, Defendants made false material representations and/or material omissions through the course of an aggressive sales and marketing operation that implemented false and misleading statements by sales representatives, Defendant-sponsored literature, and/or Defendant-sponsored promotional functions in order to promote and sell Actos while omitting material facts regarding the drug's dangerous side effects and adverse events, including evidence that Actos was associated with an increased risk of bladder cancer and heart damage.

143. Defendants knew or should have known that their representations were false or misleading and/or knew that Defendants were concealing and/or omitting material information from the medical and healthcare community at large, the general public, from Plaintiffs' medical or healthcare provider(s), and/or Plaintiffs.

144. In addition to making false and misleading material representations to the medical and healthcare community at large, the general public, Plaintiffs' medical or healthcare provider(s),

and/or Plaintiff, Defendants also fraudulently concealed and/or intentionally omitted material information, including, but not limited to, the following:

     a. That Actos was not as safe as other Forms of Type 2 diabetes treatments or drugs;

     b. That the risks of adverse events, including the risk of being diagnosed with bladder cancer as a result of ingesting the drug, were higher than those with other forms of Type 2 diabetes treatments;

     c. That the risks of adverse events, including the risk of being diagnosed with bladder cancer as a result of ingesting the drug, were not adequately tested and/or warned of by Defendants;

     d. That Actos was defective, and that it caused dangerous side effects, including being diagnosed with bladder cancer as a result of ingesting the drug, in a much higher and more significant rate than other forms of Type 2 diabetes treatments;

     e. That patients needed to be monitored more regularly for adverse events, including bladder cancer, while using;

     f. That Actos was designed negligently;

     g. That Actos lacked sufficient warnings with regard to adverse events, including bladder cancer;

     h. That Actos was designed defectively; and

     i. That Actos was designed improperly.

145.    Defendants also actively engaged in concealing and omitting post-market data and evidence known to Defendants while Actos was on the market that indicated that Actos was associated with an increased risk of bladder cancer in humans. Since 1999 Defendants were faced with multiple opportunities to inform the medical and healthcare community at large, the general public, Plaintiffs' medical or healthcare provider(s), and/or Plaintiffs of the risks and dangers of Actos, yet Defendants consciously and deliberately withheld, concealed, and omitted such information. Incidents in which Defendants actively engaged in concealing and omitting post-market data and evidence include, but are not limited to:

     a. After the release of Actos onto the market, Defendants were informed that other Type 2 diabetes drugs, compounds, or formulations in the same or substantially similar class of drugs as Actos were associated with an increased risk of bladder cancer, yet

Defendants engaged in a course of conduct to actively ignore, separate, and or disassociate Actos from being associated with any drug, compound, or formulation with an increased risk of bladder cancer without an adequate scientific or pharmacological basis for such ignorance, separation, or disassociation;

b. After the release of Actos onto the market, Defendants possessed facts and evidence that indicated that Actos was associated with an increased risk of bladder cancer in humans, and were faced with several opportunities, including suggestions from the Food and Drug Administration (FDA), to revise the packaging and/or labeling of Actos to strengthen its warnings with regard to an increased risk of bladder cancer. Not only did Defendants decline to strengthen Actos' packaging and/or labeling to inform medical and health care providers and consumers, but Defendants engaged in a false and misleading marketing and regulatory plan and/or process to aggressively combat any suggestions by regulatory and/or medical authorities that the Actos label should be revised. Defendants' plan and/or process to combat label changes through false and misleading means was often predicated upon Defendants' concerns regarding the negative sales and marketing ramifications of a label change, as opposed to patient safety;

c. After the release of Actos onto the market, Defendants possessed clinical data through studies, including Defendant-sponsored studies, that Actos was associated with a statistically significant increased risk of bladder cancer in humans. After receiving this information, Defendants engaged in false and or misleading conduct and intentionally withheld, suppressed, misrepresented, and/or concealed this data from the medical and healthcare community at large, the general public, Plaintiffs' medical or healthcare provider(s), and/or Plaintiffs.

d. Upon hearing any negative news about its competitors, such as the GlaxoSmithKline drug Avandia, Defendants conducted aggressive marketing campaigns against such competitors touting the alleged benefits of Actos over its competitor while purposefully and knowingly suppressing information about life-threatening side effects of Actos such as the increased risk of bladder cancer.

146.    Defendants had sole access to material facts concerning the defective nature of Actos and its

propensity to cause serious and dangerous side effects, including bladder cancer and heart damage, to

persons who used Actos, including Plaintiffs.

147.    Defendants' misrepresentations, concealments and omissions of material facts were

made purposefully, willfully, wantonly, and/or recklessly in order to mislead and to induce Plaintiffs'

prescribing physicians to prescribe and/or dispense Actos and to induce Plaintiffs to purchase and

consume Actos.

148.    Plaintiffs' treating physicians and Plaintiffs had no way to determine the truth behind Defendants' false and/or misleading statements, concealments and omissions surrounding Actos, and reasonably relied on false and/or misleading facts and information disseminated by Defendants, which included Defendants' omissions of material facts in which Plaintiffs' treating physicians and Plaintiffs had no way to know were omitted.

149.    Plaintiffs' treating physicians and Plaintiffs justifiably relied on the false and/or misleading statements made by Defendants and relied on Defendants' statements without knowledge of the falsity of the statements and the omissions of material facts contained therein. Defendants were in a position to disseminate information regarding the efficacy and safety of Actos and Plaintiffs' treating physicians and Plaintiffs were placed in a position to receive and rely on this information in considering whether to prescribe and/or consume Actos.

150.    Plaintiffs' treating physicians and Plaintiffs justifiably relied upon Defendants' material misrepresentations, including the omissions contained therein, when making the decision to dispense, provide, prescribe, accept, purchase, and/or consume Actos. Defendants, as was intended by their material misrepresentations and omissions, induced Plaintiffs and prescribing physicians to dispense, provide, prescribe, accept, purchase, and/or consume Actos.

151.    As a direct and proximate result of the above-stated false representations and/or omissions as described herein, Plaintiffs were injured as described above.

152.    By reason of the foregoing, Plaintiffs demand judgment against each Defendant, individually, jointly and severally for compensatory damages in a sum in excess of $75,000 and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as the Court deem proper.

153.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages in a sum that exceeds the jurisdictional limits of all lower courts that might otherwise have jurisdiction.

## EIGHTH CAUSE OF ACTION AS
## AGAINST THE DEFENDANTS
## (NEGLIGENT MISREPRESENTATION)

154.    Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

155.    During the course of business dealings with Plaintiffs and Plaintiffs' physicians, Defendants disseminated false information, through literature, published labels and otherwise, concerning the properties and effects of Actos with the intention that physicians and patients would rely upon that information in their decisions concerning the prescription and consumption of drug therapy for their patients.

156.    Defendants, as prescription drug manufacturers and/or distributors, disseminated information about Actos in order to guide Plaintiffs and Plaintiffs' physicians in the business transaction of the sale and purchase of prescription drugs.  Defendants knew or reasonably should have realized that physicians, in weighing the potential benefits and potential risks of using Actos, would rely upon information disseminated to them by the manufacturer and/or distributor of the product, and that many patients, in accordance with those prescriptions, would be likely to ingest Actos as properly dispensed by their pharmacies.

157.    Defendants, as prescription drug manufacturers and/or distributors, knew or reasonably should have realized that patients receiving prescriptions for Actos, written by physicians in reliance upon information disseminated by Defendants as the manufacturer/distributor of Actos, would be placed in peril of grievous personal injury if the information disseminated and relied upon was materially inaccurate, misleading, or otherwise false.

158.    Defendants failed to exercise reasonable care or competence to ensure that the information it disseminated to physicians concerning the properties and effects of Actos was

accurate and not misleading, and, as a result, disseminated information to physicians that was negligently and materially inaccurate, misleading, false, and unreasonably dangerous to patients such as Plaintiffs.

159.    Plaintiffs' prescribing physicians and Plaintiffs had no way to determine the truth behind Defendants' false representations and omissions surrounding Actos, and reasonably relied on false and/or misleading facts and information disseminated by Defendants, which included Defendants' omissions of material facts in which Plaintiffs' prescribing physicians and Plaintiffs had no way to know were omitted.

160.    Plaintiffs' prescribing physicians and Plaintiffs justifiably relied on the false and/or misleading statements made by Defendants and relied on Defendants' statements without knowledge of the falsity of the statements and the omissions of material facts contained therein. Defendants were in a position to disseminate information regarding the efficacy and safety of Actos and Plaintiffs' prescribing physicians and Plaintiffs were, justifiably, placed in a position to receive and rely on this information in considering whether to prescribe and/or consume Actos.

161.    As a direct and proximate result of the above-stated false representations and/or omissions as described herein, Plaintiffs suffered serious and dangerous side effects including bladder cancer, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, a risk of future cancer(s), reasonable fear of future cancer, any and all life complications caused by Plaintiffs' bladder cancer, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above.

162.    By reason of the foregoing, Plaintiffs demand judgment against Defendants for damages in a sum in excess of $75,000.00, together with interest, costs of suit, attorneys' fees and all such other and further relief as the Court deems proper.

## NINTH CAUSE OF ACTION AS
## AGAINST THE DEFENDANTS
## VIOLATION OF CONSUMER FRAUD AND
## STATE DECEPTIVE TRADE PRACTICE LAWS

163.    Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

164.    Defendants committed deceptive trade practices by knowingly making false representations and omitting and concealing material information regarding Actos' characteristics and alleged benefits and failing to disclose material information regarding known risks, including bladder cancer to Plaintiffs and Plaintiffs' Physician while manufacturing, distributing, and/or selling Actos for purchase and consumption by consumers, including Plaintiffs.

165.    Defendants' actions are deceptive and in clear violation of Consumer Protection Acts of Alabama, Florida, Kansas, Louisiana, Maryland, Michigan, Mississippi, New Mexico, North Carolina, Ohio, Virginia and Wisconsin, entitling Plaintiffs to damages and relief.

166.    Plaintiffs were consumers within the meaning of each state's Unfair and Deceptive Acts and Practices, who were deceptively and unlawfully induced to purchase Actos by Defendants.

167.    These states' Statutes make unfair and/or deceptive trade practices in the conduct of any trade or commerce illegal.

168.    These states' Statutes create a private right of action for individuals who are aggrieved by an unfair and/or deceptive trade practice by another person.

169.    These states' Statutes provide that the prevailing party in litigation arising from a cause of action pursuant to each states' Deceptive Trade Practices Act shall be entitled to recover monetary damages.

170.    Defendants are engaged in the practice of manufacturing, marketing, distributing,

selling and otherwise placing into the stream of commerce Actos which constitutes trade and commerce as defined by these states' Unfair and Deceptive Acts and Practices and are therefore subject to the same.

171.     As a result of Defendants' unfair and deceptive trade practices, Plaintiffs are entitled to monetary recovery, if each prevails.

172.     WHEREFORE, Plaintiffs demand judgment against Defendants for all damages allowed under statute, together with interest, costs of suit, including attorneys' fees, and all such other relief as the Court deems proper.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants on each of the above-referenced claims and Causes of Action and as follows:

1.     Awarding compensatory damages to Plaintiffs for injuries in an amount to be determined at trial, as alleged herein;

2.     Awarding pre-judgment and post-judgment interest to Plaintiffs.

3.     Awarding punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiffs in an amount sufficient to punish Defendants and deter future similar conduct;

4.     Awarding Plaintiffs' attorney's fees;

4.     Awarding Plaintiffs the costs of these proceedings; and

5.     Granting all such other and further relief as this Court deems necessary, just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury as to all issues.

Dated: June 11, 2014.

By: s/ Neil D. Overholtz
Neil D. Overholtz (0188761)
noverholtz@awkolaw.com
Nathan C. Bess (0051945)
nbess@awkolaw.com
**AYLSTOCK, WITKIN, KREIS &
OVERHOLTZ, PLLC**
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
Facsimile: (850) 916-7449

*Attorneys for Plaintiff*

05/05/2016    15:58 Home Solutions of Whiteville                           (FAX)9106405559                P.008/079



DRIAN F. AYLSTOCK (FL, AL, MS)*
JUSTIN G. WITKIN (FL, MS)
DOUGLASS A. KREIS (FL)
NEIL D. OVERHOLTZ (FL)
R. JASON RICHARDS (FL, CO)
BOBBY J. "BRAD" BRADFORD (FL, AL)
STEPHEN H. ECHSNER (FL)
D. RENÉE BAGGETT (FL)
DANIEL J. THORNBURGH (FL, MN)

*States in which attorney is licensed to practice law
†Of counsel

# Aylstock, Witkin, Kreis & Overholtz, PLLC

www.AWKOLAW.com

17 EAST MAIN STREET, SUITE 200 · PENSACOLA, FLORIDA 32502
PHONE: (850) 202-1010 · FAX: (850) 916-7449



E. SAMU...

CH...

P. ANN GAYLE (TX, LA, IL)
BEN H. ANDERSON (OK, CA)†
DONNA TAYLOR-KOLIS (OH)†
CHRISTOPHER J. ZIMMERMAN (OH)†

May 1, 2015

2012-07243
Ms. Joyce Campbell
PO Box 3044
Myrtle Beach, SC 29578-3044

Re: Participation in the ACTOS Bladder Cancer Resolution Program and Settlement

Dear Ms. Campbell:

Our firm is pleased to announce that we have reached an agreement with the defendants to create a settlement program for all claimants asserting injury as a result of using ACTOS. Participation in this settlement program will generate an individual settlement offer for your claim.

As you are aware, our firm has been a leader in this massive litigation effort for the past three years. Recently, our firm has been central to negotiating the settlement of the ACTOS litigation. I was personally appointed by the court overseeing the ACTOS litigation to be on the Plaintiffs' Steering Committee and was a member of the small team of lawyers that were responsible for negotiating the terms of the settlement. In addition, I will also be a member of the eligibility committee that will determine which claimants meet the eligibility requirements of the settlement. The tireless efforts of our staff and attorneys were essential to reaching this agreement. We believe that this settlement program will provide most of our clients with fair settlement offers and look forward to discussing the process with you in the coming months.

Already, our firm is preparing your file for potential inclusion in the resolution program. In the very near future, we will begin the process of estimating settlement values. The final settlement values will depend on the number of participants and how various deductions and enhancements may apply to your claim. Careful review of this information will ensure that the resolution program generates the best possible offer for your case.

Now, more than ever, it is crucial that you keep us informed of your current contact information, including correct telephone numbers, physical mailing addresses, and email addresses. Being able to contact you quickly for additional information is critical to maximizing the value of your claim. Please do not hesitate to call or email our office with any updated contact information, or if you expect to be away from home or difficult to reach for any length of time.

P.O. BOX 12630
PENSACOLA, FLORIDA 32591
PHONE: (850) 202-1010

11440 NORTH KENDALL DRIVE, PENTHOUSE 400
MIAMI, FLORIDA 33176
PHONE: (305) 220-2956 · FAX: (305) 227-2956

BRYAN F. AYLSTOCK (FL, AL, MS)*
JUSTIN G. WITKIN (FL, MS)
DOUGLASS A. KREIS (FL)
NEIL D. OVERHOLTZ (FL)
R. JASON RICHARDS (FL, CO)
BOBBY J. "BRAD" BRADFORD (FL, AL)
STEPHEN H. ECHSNER (FL)
D. RENÉE BAGGETT (FL)
DANIEL J. THORNBURGH (FL, MN)
*States in which attorney is licensed to practice law
† Of counsel



# Aylstock, Witkin,
# Kreis & Overholtz, PLLC
www.AWKOLAW.com

17 EAST MAIN STREET, SUITE 200 · PENSACOLA, FLORIDA 32502
PHONE: (850) 202-1010 · FAX: (850) 916-7449

E. SAMUEL
J
CHE

BEN R. ANDERSON (OH, CA)†
DONNA TAYLOR-KOLIS (OH)†
CHRISTOPHER J. ZIMMERMAN (OH)†

**EXHIBIT C**

June 3, 2015

*Via USPS*

2012-07243
Ms. Joyce Campbell
PO Box 3044
Myrtle Beach SC  29578-3044

  **RE:  Confidential ACTOS Bladder Cancer Resolution Program and Settlement**

Dear Ms. Campbell:

  As we previously informed you, Takeda Pharmaceuticals announced on April 28, 2015 that a settlement program has been established to resolve Actos claims involving the allegations that Actos caused bladder cancer.  The overall settlement number is $2,370,000,000 ($2.37 Billion) dollars with a potential extra $30,000,000 ($30 Million) dollars included in the event of high rates of participation.  Since we believe the participation requirements will likely be met, the total settlement number could certainly reach $2,400,000,000 (2.4 Billion) dollars.  Prior to May 8th, the claims registration deadline, our office registered your claim with the Claims Administration Office so that you would have the opportunity to participate in this settlement. At this point in time, although there are over 11,250 people registered for the settlement, we believe the actual number of claimants with qualifying claims will be between 9,000 and 10,500. This should result in a settlement average between $200,000 and $266,666 dollars per claim. However, that would only be an average claim.  In this settlement, each claim will be judged on its own merits.  Some cases will be worth over $1,000,000 dollars while others will be worth less than $100,000.   It will all depend on the claimant's amount of Actos usage, resulting injuries, and confounding factors.  We believe this settlement and the settlement process will be a fair process.   There is a neutral claims administrator that will be evaluating each claim in the settlement, and our firm will be checking their work to make sure that each claim is judged correctly.  There is also an appeals process that allows appeals to a court-appointed settlement Special Master.   This provides additional protection to ensure the fairness of the process. Finally, a member of our firm has been personally selected to serve on the eligibility committee for the settlement.  For these reasons, participation in this settlement program is a good choice for most claimants.

P.O. BOX 12630
PENSACOLA, FLORIDA 32591
PHONE: (850) 202-1010

11440 NORTH KENDALL DRIVE, PENTHOUSE 400
MIAMI, FLORIDA 33176
PHONE: (305) 220-2956 · FAX: (305) 227-2956

**Actos and Bladder Cancer:**

We believe it is in the best interest of the majority of clients to opt-in to this settlement. Our belief is primarily based upon a careful consideration of the risks of further litigation, potential further delay in reaching resolution of the cases, and the value offered in the proposed resolution program for the majority of claimants. In order to win in court on an Actos bladder cancer case we have to prove a number of things, two of which are the most difficult: 1) Actos causes bladder cancer (this is known as general causation) and, 2) Actos caused your loved one's bladder cancer (this is known as specific causation). In the Actos litigation, both general and specific causation are significant obstacles to overcome. Here is why:

1. General Causation (proving Actos causes bladder cancer)

One of the biggest hurdles is establishing that Actos causes bladder cancer. While there are studies that support the link, recently we have seen several new studies that have shown no link. The most important study to consider at this time, the KPNC ten (10) year study (which has yet to be published, but likely will be in the near future) concludes there is not a strong association between Actos and bladder cancer. While the results are not yet published, word of the results has reached many within the medical and scientific communities. The KPNC data is important is because the five *(5) year* KPNC study data showed a significant link between Actos and bladder cancer and was the data relied upon by the FDA to issue a bladder cancer warning for Actos in 2011. The recent KPNC (10) ten year data does not show the same significant association between Actos and bladder cancer. This is why the KPNC (10) ten year data is an important issue that needs to be strongly considered in deciding whether or not to continue litigating. The KPNC study was a requirement by the FDA. Moreover, Takeda is now referring to the latest KPNC study data as the "FINAL" study, which carries weight with the medical community. While we have worked very hard to find reasons to discredit these latest results, including arguing that the company changed the rules of the study, these so called "final" results will present a significant obstacle going forward.

In addition to the KPNC data, several other recent large scale studies have shown no link between Actos and bladder cancer. In particular, the *Levin* study was an international study looking at over one million patients. That study concluded: "The cumulative use of pioglitazone (Actos) or rosiglitazone was not associated with the incidence of bladder cancer in this large, pooled multi-population analysis." This study was published in March of 2015. Several other studies have reached a similar conclusion. This is a significant problem for your case.

2. Specific Causation (proving Actos caused your bladder cancer)

The second major hurdle in proving an Actos bladder cancer case is proving that Actos caused your loved one's bladder cancer. This is also very difficult, because there are a number of other risk factors that are known to cause bladder cancer. Any history of smoking, for example, is a considerable risk factor for developing cancer, especially bladder cancer. For those

P.O. Box 12630
Pensacola, Florida 32591
Phone: (850) 202-1010

11440 North Kendall Drive, Penthouse 400
Miami, Florida 33176
Phone: (305) 220-2956 · Fax: (305) 227-2956

with no smoking history, other causes of bladder cancer can include age, diesel exposure, chemical exposure, certain occupations involving any number of toxins, secondhand smoke, and various other risk factors. Indeed, this is the primary method that Takeda would use to attack your case, were it to go to trial. Perhaps even more worrisome is evidence linking bladder cancer with diabetes itself, the same disease that Actos was prescribed to treat. The primary concern with these other potential causes is that many of them have a much higher association with bladder cancer than Actos alone. Most of the Actos studies that support the bladder cancer link show an increase in risk of 40-100%. With smoking, the risk can be as high as 500%, so Takeda could present this type of data to confuse and dissuade a jury. Again, this is a significant hurdle.

**Other Issues:**

In addition to issues with general and specific causation, there are several other factors that support participation in this settlement. These include 1) the Actos warning label, 2) the FDA's recent approval of other drugs containing Actos, 3) the overall success rate in trials, and 4) information we have been receiving from doctors. Each of these deserves consideration

1. The Actos Label

Your claim against Takeda for Actos causing bladder cancer is based on the legal theory of failure to warn. In other words, if Takeda had warned my loved one and their doctor about the risk of bladder cancer, they would not have taken the drug and therefore would not have developed bladder cancer. As stated previously, the bladder cancer warning for Actos was primarily based on the five (5) year KPNC data. Should the FDA determine that the ten (10) year KPNC data is convincing and remove the bladder cancer warning, this could be a fatal development in the case. Please be assured that Takeda will present this ten (10) year data to the FDA and attempt to get the bladder cancer warning removed. This is a significant concern. Takeda also will argue to the jury that information regarding bladder cancer and Actos was in the label since 1999. This is, in fact, true.

2. Recent FDA Approval of Actos Containing Drugs

On January 25, 2013, the FDA approved a combination pill for diabetes treatment called OSENI which contains the drugs Alogliptin and Pioglitazone (Actos). This is problematic for several reasons. First, Actos has still never been removed from the market in the United States. It is much easier to win a defective drug case when the drug has been withdrawn or recalled. Yet, Actos is remains on the market and the FDA keeps approving combination drugs with Actos in them, even with the recognized bladder cancer risk. This fact will likely come in to evidence and the Takeda will use it as an example of an FDA stamp of approval, even with an existing bladder cancer warning (i.e. "If this drug is so bad, why is it still on the market and why does the FDA keep approving it?").

P.O. BOX 12630
PENSACOLA, FLORIDA 32591
PHONE: (850) 202-1010

11440 NORTH KENDALL DRIVE, PENTHOUSE 400
MIAMI, FLORIDA 33176
PHONE: (305) 220-2956 · FAX: (305) 227-2956

3. Trial results

Thus far, there have been nine Actos trials. The most well-known one resulted in a nine billion dollar verdict ($9,000,000,000) for the Plaintiff. Our firm's partners were key members of this trial team. Our lawyers also participated in the post-trial briefing in the case and are currently working on Takeda's appeal of the verdict. That verdict was reduced to approximately $37 million and is currently on appeal. We are hopeful that the verdict will stand, but we also understand that the Fifth Federal Circuit, which is not known as being plaintiff-friendly, will review the appeal. Still, the evidence was presented at trial properly and the presiding judge was very careful with how the case was handled. Those facts bode well for the plaintiff on appeal. However, verdicts with large punitive awards undergo very tight scrutiny by our Court systems, and punitive awards as large as that one will likely be reduced significantly. The companies argue that such awards deny them due process rights, especially when they are more than 10X (ten times) the compensatory award. Further, evidence was admitted in this trial of the destruction of documents by Takeda, and it is believed by Takeda and many others that this evidence tainted the jury against Takeda, and that an appellate court would likely rule that such evidence should not be admitted or at least be significantly limited.

Other trials have had mixed results. In two of the four plaintiff verdicts, judges reversed the plaintiffs' jury verdicts and ruled in favor of Takeda. In the remaining cases, the juries simply ruled for Takeda. Thus, the results have been mixed, with Takeda prevailing more often than plaintiffs. All but one of these trials also excluded evidence of any document destruction by Takeda. And we are not confident that such evidence will come into future trials.

There is no guarantee that a jury or judge will find in your favor. The bottom line is that more of the trials up to this point have resulted in verdicts for Takeda than for the plaintiffs. We believe in our case, and believe when the evidence comes in correctly, the plaintiff has a good chance to win, but the other possibility must be seriously considered.

4. Information from Doctors

The information that we have accumulated from many doctors up to this point has been problematic from a causation standpoint. One problem we have observed is that many prescribing doctors continue to prescribe Actos, even after the bladder cancer warning was added to the label. This makes proving a "failure to warn" case difficult, in light of the fact that our case is essentially based on doctors not prescribing the drugs after they learn of the danger. Here, Takeda can point out that the bladder cancer warning meant little to nothing to the doctor ("Dr. Smith kept almost all of his patients on Actos even after the bladder cancer warning was added to the label.")

P.O. Box 12630
Pensacola, Florida 32591
Phone: (850) 202-1010

11440 North Kendall Drive, Penthouse 400
Miami, Florida 33176
Phone: (305) 220-2956 · Fax: (305) 227-2956

**The Settlement Provides Fair Compensation For Most Claimants**

Considering the above-mentioned risks, at this time we believe that participation in this settlement is a good choice at this time for the majority of our clients. Unfortunately, we cannot tell you what your case is worth under the settlement program at this point in time, because we do not know exactly the number or participants or the value of the points that will be awarded to your case. However, we can explain the criteria for determining the value of your claim. Each claim is evaluated on its own merits.

The Master Settlement Agreement encompasses the entire agreement between the parties and is a lengthy and detailed document. However, what is important is how the agreement affects your specific claim. This can be assessed with two questions. First, are you eligible to participate? Second, if you are eligible, how will your compensation be determined?

1. Are you an eligible claimant?

   To be eligible, you must meet the following criteria:

   a. You or Your loved one used Actos Products prior to December 1, 2011; and,
   b. You or Your loved one was diagnosed with bladder cancer. Bladder Cancer is defined as cancer that formed in the urothelial lining of the urinary bladder, the renal pelvis or the ureter.

2. Now that you're an eligible claimant, how and how much will you be paid?

   As indicated above, Takeda Pharmaceuticals has agreed to pay approximately $2.37 billion to settle all registered and eligible Actos claims, which we believe will number between 9,000 and 10,500 claims. If 95% of claimants agree to participate, this money will be placed in a settlement fund. Each claim will be evaluated and awarded a number of points. It is not possible at this time to know the value of a point, but what we do know is that the case value average should be approximately $200,0000-266,666.00. There are thirteen areas where points will be either increased or decreased, including extent of injury and treatment, age at the time of diagnosis, length of time Actos was ingested, dosage of Actos ingested, and other risk factors for bladder cancer such as smoking.

**How many points do I have?**

For your convenience, we have attached as Exhibit "A" to this letter, a grid that you can use to estimate your points. Again, we do not know what the value of a point will be but this calculation of points should give you some idea as to the strength of your claim.

P.O. Box 12630
Pensacola, Florida 32591
Phone: (850) 202-1010

11440 North Kendall Drive, Penthouse 400
Miami, Florida 33176
Phone: (305) 220-2956 · Fax: (305) 227-2956

The first two things you need to calculate your base point level is age at diagnosis of injury plus level of injury. As you can see, on Exhibit "A", there are five different levels of injury ranging from low grade cancer to death caused by bladder cancer. Your loved one's age plus their injury level will give you your base points.

After you have your base points, you look at Actos usage to determine if your basis will be reduced or increased. This is based on the total number of milligrams of Actos ingested. The easiest way to calculate this is the total milligrams of Actos pills taken, multiplied by the number of days of Actos ingestion. The calculations take consideration of the state of science and medicine with regard to proving whether someone's bladder cancer was likely caused by Actos. Thus, those with more Actos ingestion had more exposure to Actos, making it more likely that a person's bladder cancer was caused by Actos. Alternatively, the less Actos ingested, the less likely a person's bladder cancer was caused by Actos. As you will see, someone with many years of Actos ingestion may see an increase in base points, while someone with only limited Actos ingestion may see a significant reduction. For illustration, if someone had only a few weeks of Actos ingestion, a judge could throw out that person's case upon ruling that the science does not support that the bladder cancer could have been caused by such limited exposure to Actos.

Following this base calculation, you will see several possible deductions. These deductions factor in medical causation as well as legal causation which could negatively affect your case. Primarily, these focus on alternate potential causes of your bladder cancer. As you can tell, the most significant alternate cause is smoking. Simply put, you need to calculate your base points and then adjust those points based upon cumulative dosage for Actos, and then reduce for other risk factors. This should give you your points. It is important for you to know that these points will be calculated based on contemporaneous medical records. In other words, if the medical records indicate that at the time of the bladder cancer diagnosis, your loved one was a current smoker, you cannot attempt to negate those records with an affidavit claiming that they never smoked. Stated another way, your point value will be based upon the medical records.

Your total number of points will be multiplied by the point value to give you a gross settlement number. From this gross settlement, attorneys' fees, expenses, and healthcare liens will be deducted. Your net recovery will be the gross settlement minus those fees, expenses, and liens. We believe that the settlement accounts for these positive and negative factors in each claim in a generally fair and equitable manner. We believe the settlement is a good and fair settlement for most of our clients.

The Settlement Program provides that a partial payment will be made to qualifying claimants after an estimated points value has been determined. This payment will be made to claimants who have complied with all requirements regarding signing of releases and in accordance with laws governing Medicare, Medicaid and SCHIP. The remainder of a qualifying

P.O. BOX 12630
PENSACOLA, FLORIDA 32591
PHONE: (850) 202-1010

11440 NORTH KENDALL DRIVE, PENTHOUSE 400
MIAMI, FLORIDA 33176
PHONE: (305) 220-2956 · FAX: (305) 227-2956

Claimant's final gross settlement value will be paid when all eligible, participating claims nationwide have been fully processed. The deadline for all claimants to enroll is July 13, 2015. Within about 90 days of enrollment, all supporting documentation must be submitted. This process should be complete by the end of October. This does not mean that payments will be made in October. And there could be deadline extensions that could push back the anticipated timeline by several months. We will keep you informed as we learn of any new information regarding the progress of the settlement. Thereafter, the interim payment schedule will be set and work will begin on the final claims evaluation. This process will likely take a year or slightly more to complete.

**IN ORDER TO BE CONSIDERED FOR THE PARTIAL PAYMENT, THE PROPER DOCUMENTS MUST BE EXECUTED AND RETURNED TO THE CLAIMS ADMINISTRATOR BY OUR OFFICE NO LATER THAN JULY 13, 2015. THERE ARE ABSOLUTELY NO EXCEPTIONS TO THIS DEADLINE.**

**Failure to Enroll in the Settlement Program**

If you choose not to enroll in the Settlement Program, your Actos claims against Takeda and Eli Lilly will continue in the judicial system. The court overseeing the litigation has issued an order that will require every case that does not enroll in the Settlement Program to produce expert reports from qualified experts within 60 days, supporting the opinion that Actos causes bladder cancer (general causation) and was a cause of bladder cancer in that particular case (specific causation). Finding an expert to support general and specific causation is both costly and can be difficult depending on the particular facts of an individual case. Even if we are able to obtain the necessary expert reports on your behalf, your case might not reach trial for many years. There is no guarantee of whether or when your case will make it to trial, and trial is always risky because you could win or lose your case.

A jury trial is always a risk. A jury could award you money, or find in favor of Takeda and award you nothing. Even if you are successful at trial, a Defendant always has the right to appeal your jury award. The appeal process may take several years to complete and will result in additional costs and expenses in your case. Any monies awarded by the jury cannot be paid to you until the appeal process is complete and a finding has been made in your favor. Further, an appeal could also result in a new trial being ordered and the entire litigation process would then start over again. Thus, you run a significant risk of ultimately receiving nothing for your Actos claims against Takeda and Eli Lilly if you choose not to participate in the settlement program.

**Conclusion**

In light of all of the above, we believe that the claim valuation process is a fair process. We further believe that participation in the Settlement Program is likely the best opportunity for the majority of our clients to receive fair compensation for their Actos claim in the foreseeable near future. Thus, provided you have a qualifying claim, there is little doubt that you will

P.O. BOX 12630
PENSACOLA, FLORIDA 32591
PHONE: (850) 202-1010

11440 NORTH KENDALL DRIVE, PENTHOUSE 400
MIAMI, FLORIDA 33176
PHONE: (305) 220-2956 · FAX: (305) 227-2956

8 | Page

receive compensation for your claim more quickly under the Settlement Program than through the tort system. The court that is overseeing all of these claims has in fact halted all work and deadlines on the cases, meaning that future trial dates have been pushed back significantly. Please note, however, that Takeda has the option not to fund the Settlement Program and to terminate the Settlement Program if a minimum number of potentially eligible Claimants do not agree to participate.  In the event of such a termination by Takeda, any Release you sign would be void, your claim would return to the court system, and you would be returned essentially to the same position you are in today.

Please note you must keep the terms of this Settlement Program, including your estimated individual settlement offer amount, confidential.  As set out in the "Confidentiality" section of the Release, you may not disclose any of the terms, conditions, and/or dollar amounts of this Settlement Program to anyone except your accountant, tax advisor, and/or financial advisor.  As set out in the Release, you "shall make no statement (regarding this Settlement Program or your individual settlement) to the media (in a press release, interview, or otherwise), including but not limited to newspapers, legal publications, the internet, social media, electronic or print media, television, radio or any other publication or medium."

If you have any questions, please contact our office.  Otherwise we will update you as the settlement progresses.  Please read the next pages carefully and sign and return to our office if you agree to enter the settlement program.  Please use the enclosed envelope to return your forms.  If possible, please scan/photo and email them to us as well at pbarr@awkolaw.com.

Best regards,

Neil D. Overholtz

Ndo/esg

Enclosures

P.O. Box 12630
Pensacola, Florida 32591
Phone: (850) 202-1010

11440 North Kendall Drive, Penthouse 400
Miami, Florida 33176
Phone: (305) 220-2956 · Fax: (305) 227-2956

## SETTLEMENT PROGRAM CONSENT FORM

**The decision of whether to participate in the Settlement Program is yours to make. If you wish to participate in the settlement,** please note that by doing so you are agreeing to two things: (1) you are giving up your right to a trial against Takeda **and** (2) you are agreeing to accept the settlement value that your claim will be accorded through the Settlement Program.

   **In order to participate in this settlement program, you should read all of the enclosed documents, then sign and return the following to our office no later than** *June 15, 2015*:

   **(a) This letter (where indicated below);**

   **(b) Release of All Claims Form (this must be notarized) (enclosed);**

   **I encourage you to carefully review the enclosed documents and to view the settlement website, www.officialactossettlement.com.**

   "I have read this letter, have had the opportunity to review the information on the Actos settlement website, www.officialactossettlement.com, and agree to participate in the Settlement Program, and waive my right to continue to pursue a lawsuit. I understand that the value of my claim will be determined only after I enter the settlement program, and will depend on the number of claims submitted, and the individual issues in my case including the amount of Actos ingested, and the information contained in the medical records, including the type and severity of bladder cancer and treatment, smoking history, and exposure to other risk factors for bladder cancer. I understand that I will not be able to change my mind if I am not happy with the final settlement amount, and cannot reject such final determined settlement amount."

6-10-15                    Joyce Campbell
Date                       Signature

Joyce Campbell
Printed Name 2012-07243

County/City of Horry
Commonwealth/State of South Carolina
The foregoing instrument was acknowledged before
me this 10 day of June, 20 15
by Joyce Campbell
(name of person seeking acknowledgement)

Notary Public
My Commission Expires: Mar 2020

P.O. BOX 12630
PENSACOLA, FLORIDA 32591
PHONE: (850) 202-1010

11440 NORTH KENDALL DRIVE, PENTHOUSE 400
MIAMI, FLORIDA 33176
PHONE: (305) 220-2956 · FAX: (305) 227-2956

10 | Page

**Extraordinary Injury Payment**

Please note: There is a provision in the settlement called **Extraordinary Injury Payments**. This is basically a payment for those qualifying claimants who have experienced large economic losses. The total EIP for all claimants will not exceed $50 million. There is a special review process for claimants who want to be considered for these payments and this process will cost $1000 dollars if you are unsuccessful. Further, if you are unsuccessful in making a claim for extraordinary injury, your entire claim can be re-reviewed by the Court appointed Settlement Special Master, which could potentially result in a reduction of your settlement value. To qualify for this payment you or the person you seek to represent must (i) have (or be a Qualifying Program Claimant on behalf of a Product User that has) Specified Documented Economic Damages of not less than $200,000 (Specified Documented Economic Damages include such things as past out-of-pocket medical expenses, past lost wage or future lost wages [through a date to be determined by the Claims Administrator] and must be confirmed by medical records, medical bills, tax returns, social security earnings statements or other documentation); (ii) establish an injury of Bladder Cancer and have had minor children at the time of the Product User's alleged injury; and/or (iii) establish extenuating circumstances relative to the Product User's alleged injury warranting compensation not otherwise addressed by the Points Award Process. In order to apply for this payment, you must be able to document that you have experienced economic damages of $200,000.00 or more. If you think that you qualify for Extraordinary Injury Payments, please check the box below. You must quickly provide your economic proof.

✔ I believe that I am qualified to receive Extraordinary Injury Payment because I meet one or both requirements above and I can/will provide documentation.

_Joyce Campbell_
Signature of Claimant or Representative
2012-07243

County/City of Horry
Commonwealth/State of South Carolina
The foregoing instrument was acknowledged before me this 16 day of June, 20 15 by Joyce Campbell
(Name of person seeking acknowledgement)

_Lara Spry_
Notary Public
My Commission Expires: 12/6/2020

P.O. Box 12630
Pensacola, Florida 32591
Phone: (850) 202-1010

11440 North Kendall Drive, Penthouse 400
Miami, Florida 33176
Phone: (305) 220-2956 · Fax: (305) 227-2956

## WHAT YOU MUST DO NOW AND BEFORE JUNE 26, 2015:

- If you wish to enroll in the settlement program then you **MUST SIGN THE ATTACHED "SETTLEMENT PROGRAM CONSENT SIGNATURE PAGE"** and return immediately, but no later than **June 26, 2015**
- Review the Extraordinary Injury Payment information sheet and determine whether you believe you may qualify for such payment. If you do, you must sign and return to our office immediately, but no later than **June 26, 2015**, so we can further evaluate whether we can make such claim.
- If applicable, complete the Deceased Claimants List of Heirs Form and return the same to our office immediately, but no later than **June 26, 2015**.
- Sign the attached **CONFIDENTIAL SETTLEMENT RELEASE** on **page 9** in the presence of a Notary and return to our office **immediately**, but no later than **June 26, 2015**. **If you are married**, your spouse must sign **page 10** of the **CONFIDENTIAL SETTLEMENT RELEASE** in the presence of a Notary and return the signed and notarized forms to our office immediately, but no later than **June 26, 2015**.
- **If you are a Representative Claimant** signing on behalf of your deceased loved one, please sign **page 9** of the **CONFIDENTIAL SETTLEMENT RELEASE** as the Representative, **and** also sign **page 10** of the **CONFIDENTIAL SETTLEMENT RELEASE** as a **Derivative Claimant**. Please also have any other potential heirs of your deceased loved one sign the duplicate Derivative Pages enclosed, and return the signed forms to our office immediately, but no later than **June 26, 2015**.
- Review the settlement website for more information. http://www.officialactossettlement.com
- Call our office at 877-810-4808 with any questions, or email us at pbarr@awkolaw.com

P.O. Box 12630
Pensacola, Florida 32591
Phone: (850) 202-1010

11440 North Kendall Drive, Penthouse 400
Miami, Florida 33176
Phone: (305) 220-2956 · Fax: (305) 227-2956

EXHIBIT

_D_

## SETTLEMENT PROGRAM CONSENT FORM

**The decision of whether to participate in the Settlement Program is yours to make.  If you wish to participate in the settlement,** please note that by doing so you are agreeing to two things: (1) you are giving up your right to a trial against Takeda **and** (2) you are agreeing to accept the settlement value that your claim will be accorded through the Settlement Program.

In order to participate in this settlement program, you should read all of the enclosed documents, then sign and return the following to our office no later than _June 15, 2015_:

(a) This letter (where indicated below);

(b) Release of All Claims Form (this must be notarized) (enclosed);

I encourage you to carefully review the enclosed documents and to view the settlement website, www.officialactossettlement.com.

"I have read this letter, have had the opportunity to review the information on the Actos settlement website, www.officialactossettlement.com, and agree to participate in the Settlement Program, and waive my right to continue to pursue a lawsuit. I understand that the value of my claim will be determined only after I enter the settlement program, and will depend on the number of claims submitted, and the individual issues in my case including the amount of Actos ingested, and the information contained in the medical records, including the type and severity of bladder cancer and treatment, smoking history, and  exposure to other risk factors for bladder cancer.  I understand that I will not be able to change my mind if I am not happy with the final settlement amount, and cannot reject such final determined settlement amount."

6-10-15                                      Joyce Campbell
Date                                          Signature

Joyce Campbell
Printed Name 2012-07243

County/City of Horry
Commonwealth/State of South Carolina
The foregoing instrument was acknowledged before
me this 10 day of June , 20 15
by Joyce Campbell
(name of person seeking acknowledgement)
John Spm
Notary Public
My Commission Expires: 12/10/2020

P.O. BOX 12630
PENSACOLA, FLORIDA 32591                11440 NORTH KENDALL DRIVE, PENTHOUSE 400
MIAMI, FLORIDA 33176

EXHIBIT

**E**

## BANKRUPTCY QUESTIONNAIRE

### LITIGATION: ACTOS

I.  Client Name: Joyce Frink (Campbell)

II.  D.O.B.: ~~....~~    SSN: -4574

III.  HAVE YOU EVER DECLARED BANKRUPTCY?  Yes or No (circle one)

IF YES: PLEASE PROVIDE THE FOLLOWING:
STATE: North Carolina          DATE FILED: 01-04-2004
COURT FILED: North Carolina Eastern   DATE DISCHARGED: 04/24/2004
Bankruptcy Court
CHAPTER: 13

(a) NAME OF ATTORNEY HANDLING: Bruce F. Jobe, PA
      ADDRESS: 4312 Ludgate St. Lumberton NC 28358
      TELEPHONE: 910-739-1010

(b) NAME OF BANKRUPTCY TRUSTEE: Robert B Browning
      ADDRESS: 200 E 4th St. Greenville NC
      TELEPHONE: 252-758-6530    27858

IV.  HAS THE BANKRUPTCY BEEN CLOSED?  Yes or No (circle one)

IF YES: PLEASE PROVIDE THE FOLLOWING:

DATE OF DISCHARGE: 04/24/2004

_Joyce Frink_          11/14/15
SIGNATURE              DATE

Joyce Frink (Campbell)

**\*\*IF YOU HAVE ANY COURT DOCUMENTS RELATED TO THE
BANKRUPTCY FILING AND/OR DISCHARGE PLEASE
PROVIDE TO OUR OFFICE.\*\***

EXHIBIT
F

## ACTOS RESOLUTION PROGRAM CLAIM FORM

### INSTRUCTIONS

The Claim Package, including a completed copy of this Claim Form, must be submitted no later than the Claim Package Deadline for all Claimants, including unrepresented (*pro se*) Claimants, in the ACTOS Resolution Program (the "Program") outlined in the Master Settlement Agreement of April 28, 2015 (the "Agreement" or "MSA").

Counsel for Claimants may complete this Claim Form, but the Claimant must personally sign the Certification and Authorization in Section VII. All *pro Se* Claimants must complete this Claim Form in its entirety.

### I.A. ACTOS Product User

| 1. | ACTOS Product User Name | Last Campbell | | First Joyce | | Middle A |
|---|---|---|---|---|---|---|
| 2. | Social Security Number | | 4\|5\|7\|4\| | | 3. Date of Birth | 1960 (month) (day) (year) |

| 4. | Address | Street P.O Box 3044 | | | | |
|---|---|---|---|---|---|---|
| | | City Myrtle Beach | | State SC | Zip 29578 | |

| 5. | Telephone Number | (910) 228 - 1563 | 6. Email | Frinkjoyce1960@yahoo.con |
|---|---|---|---|---|

| 7. | Any other names by which ACTOS Product User has been known, including but not limited to maiden name. | Keel, Frink |
|---|---|---|

### I.B. PRIMARY COUNSEL INFORMATION

| 1. Attorney Name | Last Overholtz | | First Neil | | Middle |
|---|---|---|---|---|---|
| 2. Firm Name | Aylstock, Witkin, Kreis & Overholtz, PLLC | | | | |

| 3. Address | Street 17 East Main Street Suite 200 | | | | |
|---|---|---|---|---|---|
| | City Pensacola | State FL | Zip 32502-5998 | Country United States | |

| 4. | Telephone Number | (8 5 0) 2 0 2 - 1 0 1 0 | 5. Facsimile | (___) ___ - ____ |
|---|---|---|---|---|
| 6. | Email | noverholtz@awkolaw.com | | |

### I.C. CASE INFORMATION (if applicable)

| 1. Court/Jurisdiction | United States District Court for the Western District of Louisiana |
|---|---|
| 2. Case Caption | Randall W. Myers, et al. v. Takeda Pharmaceuticals U.S.A., Inc. |
| 3. Case No. | 14-1258 |

Claimant ID: 13924

## II. PERSONAL REPRESENTATIVE INFORMATION FOR MINOR, DECEASED, OR INCAPACITATED CLAIMANTS

**1.** Is the Claim being brought regarding the Actos Product User by a Representative?

YES ☐        NO ☒

If Yes, complete this Section II. If No, skip to Section III.

| **2. Relationship to Product User** (check all that apply) | ☐ Spouse ☐ Parent ☐ Child ☐ Sibling <br> ☐ Administrator ☐ Executor ☐ Other _____ (specify) |

| **3. Representative's Name** | Last | First | Middle |
|---|---|---|---|
| | | | |

| **4. Representative's Address** | Street |
|---|---|
| | City    State    Zip    Country |

| **Representative's 5. Telephone Number** | (__) __ - __ | **6. Email** | |

| **7. Representative's SSN** | ⌷⌷⌷-⌷⌷-⌷⌷⌷⌷ | **8. Date of Birth** | __/__/__ (month) (day) (year) |

| **9. Death of Product User** (if applicable) | __/__/__ (month) (day) (year) | **10. Do you claim that ACTOS Products caused the Death?** (if applicable) | YES ☐  NO ☐ |

## III. CLAIM INFORMATION

### ALLEGED INJURY LEVEL
Select the highest injury level category that can be proven by the records submitted as part of this Claims Package.

| | |
|---|---|
| ☒ | **Level 1:** Diagnosis of Ta or Tis, low grade (G1 or G2), Bladder Cancer, as determined by a Pathology Report, OR diagnosis of Bladder Cancer without a recurrence with unspecified pathology classification. <br><br> Product Users who had a diagnosis of Bladder Cancer prior to the use of ACTOS products, but who allege a recurrence of Bladder Cancer as a result of ACTOS usage are also included in this Injury Level 1. |
| ☐ | **Level 2:** Diagnosis of Ta or Tis, high grade (G), or T1 Bladder Cancer, OR the diagnosis of a recurrence of Bladder Cancer.  153 09  (180 pts) $1,600.00 per pt. |
| ☐ | **Level 3:** Diagnosis of T2 Bladder Cancer OR radiation therapy for the treatment of Bladder Cancer OR systemic (oral or intravenous) chemotherapy for the treatment of Bladder Cancer (not to include direct bladder treatments). |
| ☒ | **Level 4:** Diagnosis of T3 Bladder Cancer OR partial or radical cystectomy or nephrectomy for the treatment of Bladder Cancer. (A cystectomy is as a surgical procedure to remove all or part of the urinary bladder.) |
| ☐ | **Level 5:** Diagnosis of T4 Bladder Cancer OR death from Bladder Cancer. Death from Bladder Cancer must be proven by autopsy or death certificate attributing the death to Bladder Cancer as a primary or secondary cause of the death, or by a contemporaneous medical record reflecting that a qualified medical professional has determined Bladder Cancer to be a primary or secondary cause of the death. |

Claimant ID: 13924

| | **CUMULATIVE ACTOS DOSAGE** |
|---|---|
| | **Select the highest cumulative dosage category that can be proven by the records submitted as part of this Claims Package.** |
| ☐ | Less than 900 mg, and Bladder Cancer was diagnosed three years or longer after last use of ACTOS Products as documented in contemporaneous Pharmacy or Medical Records. |
| ☐ | Less than 900 mg, and Bladder Cancer was diagnosed less than three years after last use of ACTOS Products as documented in contemporaneous Pharmacy or Medical Records. |
| ☐ | 900 mg to 2,699 mg |
| ☐ | 2,700 mg to 5,399 mg |
| ☐ | 5,400 mg to 10,799 mg |
| ☒ | 10,800 mg to 16,199 mg ~Started taking Actos in 1999 - 2012  30Mg 1 daily~ |
| ☐ | 16,200 mg to 21,599 mg |
| ☐ | 21,600 mg to 28,799 mg |
| ☐ | 28,800 mg to 43,199 mg |
| ☐ | 43,200 mg to 56,699 mg |
| ☐ | 56,700 mg and above |

**EXTRAORDINARY INJURY CLAIM**

Claimant must indicate below whether he or she is applying to be considered for an Extraordinary Injury Payment ("EI Payment"), as set forth in Section 7.02 of the Agreement. To be eligible to be considered for an EI Payment, Product User must (i) have Specified Documented Economic Damages of not less than $200,000; (ii) establish an injury of Bladder Cancer and have minor children at the time of the Product User's alleged injury; and/or (iii) establish extenuating circumstances relative to the Product User's alleged injury warranting compensation that are not otherwise addressed by the Points Award Process.

Please specify whether an EI claim is made by checking the applicable box below:

☐ Claimant **APPLIES** for an EI Payment based on Specified Documented Economic Damages of not less than $200,000;

☐ Claimant **APPLIES** for an EI Payment based on the Product User's injury or Death due to Bladder Cancer with minor children at the time of the Product User's alleged injury;

☒ Claimant **APPLIES** for an EI Payment based on extenuating circumstances relative to the Product User's alleged injury warranting compensation that are not otherwise addressed by the Points Award Process; OR

☒ Claimant **DOES NOT APPLY** for an EI Payment.

**IV. CLAIM PACKAGE MATERIALS**

Attach all Claim Package materials as required by Section 3.03 of the MSA. Indicate that you are submitting the following by checking the box(es) below:

| ☒ | A completed Claim Form that contains the Personal Signature of the Claimant. |
|---|---|
| ☐ | A completed and signed Authorization to Release Records and Other Information contained in Appendix I of the Agreement. The Claims Administrator can provide this form. When executing this document, the Claimant shall not specify particular healthcare providers for the collection of records, but shall leave the provider field of the form blank so that it may be utilized for collection of any necessary records in accordance with Section 8.05 of the MSA. |
| ☐ | Medical Records of Bladder Cancer diagnosis, as set forth in Section 3.03(A)(3)(i) of the MSA. |

Claimant ID: 13924

| ☐ | Records reflecting proof of ACTOS Products usage, as set forth in Section 3.03(A)(3)(ii) of the MSA. |
|---|---|
| ☐ | Complete medical records from all healthcare providers who (i) diagnosed the Product User's Bladder Cancer; and/or (ii) provided treatment for the Product User's Bladder Cancer, as set forth in Section 3.03 (A)(3)(iii) of the MSA. |
| ☐ | Medical records from all healthcare providers who prescribed ACTOS Products to the Product User, for the period spanning first alleged use of ACTOS Products through the last use of ACTOS products, as set forth in Section 3.03(A)(3)(iv) of the MSA. |
| ☐ | Medical records from all healthcare providers who served as the Product User's primary care provider, for the period spanning three years prior to the diagnosis of Bladder Cancer through the time of the diagnosis of Bladder Cancer, as set forth in Section 3.03(A)(3)(v) of the MSA. |
| ☐ | If Program Participant is alleging Bladder Cancer involving the urothelial lining of the renal pelvis, complete medical records from any nephrologist(s) who treated the Product User, as set forth in Section 3.03(A)(3)(vi) of the MSA. |
| ☐ | If death due to Bladder Cancer is alleged, a Death Certificate or Autopsy Report, as set forth in Section 3.03(A)(3)(vii) of the MSA. |
| ☐ | Wire instructions for use by the QSF Administrator, as set forth in Section 3.03(A)(4) of the MSA.  The Claims Administrator will make this form available. |
| ☐ | Where the Claim is being brought in a representative capacity by a Program Participant who is not the Product User, documentation, such as letters of administration, sufficient to establish that the representative Program Participant is the duly authorized legal representative for the Product User or the Product User's estate, as set forth in Section 3.03(A)(5) of the MSA. |
| ☐ | A W-9 Form, which will be made available by the Claims Administrator, providing the information required by such form for Primary Counsel. Each Primary Counsel shall provide only one W-9 Form, as set forth in Section 3.03(A)(6) of the MSA. |

## V.  PRODUCT USER'S ELIGIBILITY FOR MEDICARE OR MEDICAID

| A. | Pursuant to the requirements of Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007, codified at 42 U.S.C. 1395y(b)(7) and (b)(8), Claimant and Counsel for Claimant represent and warrant that the following information provided in this form is complete and accurate:  (1) the Product User's Social Security Number; (2) the Product User's full legal name; and (3) the Product User's date of birth. |
|---|---|
| B. | Certification Relating to Medicare and Medicaid Eligibility:<br><br>To the best of her knowledge, Claimant certifies, by indicating below, that<br><br>☐ Product User **IS** (or **WAS** prior to death) Currently eligible to receive Medicare benefits.<br>☒ Product User **IS NOT** (or **WAS NOT** prior to death) eligible to receive Medicare benefits.<br>☒ Product User **IS** (or **WAS** prior to death) currently eligible to receive Medicaid benefits.<br>☐ Product User **IS NOT** (or **WAS NOT** prior to death) eligible to receive Medicaid benefits. |

## VI.  CERTIFICATION REGARDING BANKRUPTCY

Claimant certifies, by indicating below, that

☐ The Product User **HAS BEEN** (or **WAS** prior to death) a party in a bankruptcy action seeking bankruptcy protection.

☒ The Product User **HAS NOT BEEN** (or **WAS NOT** prior to death) a party in a bankruptcy action seeking bankruptcy protection.

## VII.  CERTIFICATION, AUTHORIZATION AND SIGNATURE
**This form must be signed by Claimant (the ACTOS Product User or the legal representative of a deceased or incapacitated Product User).**

Claimant ID: 13924

I declare under penalty of perjury subject to 28 U.S.C. § 1746 that all of the information provided in this Claim Form is true and correct. Additionally, I certify that I have provided to my attorney (if any) full information regarding all of my relevant healthcare providers and pharmacies that dispensed ACTOS Products and that any Core Medical Records I provided to my attorney (or if unrepresented, to the Claims Administrator) are true and correct.

| Product User/<br>Representative's<br>Signature | *Joyce A. Funk Campbell* | Date | 01 / 06 / 2016<br>(month/day/year) |
|---|---|---|---|
| Printed Name | First<br>Joyce | MI<br>A | Last<br>Campbell |

**Trustee Questionnaire**

EXHIBIT

G

Case No. _____

**When your case is called, please have the following ready to hand to the trustee:**

- Proof of Identity (picture id such as a drivers license or other state issued id card)
- Proof of Social Security Number (proof must be from a 3rd party such as a social security card)
- This completed questionnaire including front and back. If you have filed bankruptcy with your spouse, they should fill out a separate questionnaire.
- Any compliance documents or additional documents requested by the trustee not previously provided.

**THIS QUESTIONNAIRE WILL BE ADOPTED AS A PART OF THE RECORD OF YOUR §341 MEETING. WHEN PROVIDING ANSWERS TO THESE QUESTIONS YOU ARE DOING SO UNDER OATH AND UNDER PENALTY OF PERJURY.**

**Section 1**
Full name: _Joyce Ann Frink_
Mailing address: _P.O. Box 294_
_Chadbourn NC 28431_

Current employer(s): _Disability_

Drivers license number: _308_                     State: _S.C_
Do you have any objection to the trustee calling you directly regarding matters concerning the bankruptcy estate? _NO_
If no, please provide your telephone number: _910-228-1563_

**Section 2**
Are you responsible for any Domestic Support Obligations as described in 11 U.S.C. § 101(14A)? _NO_
[debt owed to or recoverable by spouse, former spouse, child, child's guardian or governmental unity in the nature of alimony, maintenance or support]

If no please continue to Section 3 on the reverse side.
If yes please complete the remaining questions in Section 2 and then continue to Section 3 on the reverse side.

Current marital status:    ☐ Married    ☐ Divorced    ☐ Separated    ☐ Widowed

Full name and address of person to whom Domestic Support Obligation is owed:

_____
_____
_____

Are support payments deducted from your paycheck?    ☐ Yes    ☐ No

Name(s) of any creditor for any debt that will not be discharged and/or that you will reaffirm:

_____
_____
_____

Employer name and address:

_____
_____

**Section 3**

| | | | |
|---|---|---|---|
| 1. | Has your mailing address changed since your case was filed? | ☐ Yes | ☑ No |
| 2 | Has your physical address changed since your case was filed? | ☐ Yes | ☑ No |
| 3. | Has your employment situation changed since your case was filed? | ☐ Yes | ☑ No |
| 4. | Have you ever filed bankruptcy before this case? <br> If yes, where, when and what chapter? _____ | ☐ Yes | ☑ No |
| 5. | Is there anyone you may have owed money to on the date your case was filed who is not listed in your bankruptcy schedules? | ☐ Yes | ☑ No |
| 6. | Is there anything that you owned or may have had a claim to ownership in on the date your case was filed that is not listed in your bankruptcy schedules? | ☐ Yes | ☑ No |
| 7. | Is there anything that you have or may have had an interest in, whether realized or not, on the date your case was filed that is not listed in your bankruptcy schedules? | ☐ Yes | ☑ No |
| 8. | Are you entitled to or possibly entitled to any inheritance or proceeds of an insurance policy, annuity, pension or other benefit based on someone's death? | ☐ Yes | ☑ No |
| 9. | Did you acquire any property or any interest in any property within the 90 days prior to the date your case was filed? | ☐ Yes | ☑ No |
| 10. | Do you own any real estate? | ☑ Yes | ☐ No |
| 11. | Is there anything you own or have an interest in that is not in your possession? | ☐ Yes | ☑ No |
| 12. | Does anyone owe you money or do you feel you may have a claim against anyone that is not listed in your bankruptcy schedules? | ☐ Yes | ☑ No |
| 13. | Do you own collectible items such as coins, stamps, antiques or guns? | ☐ Yes | ☑ No |
| 14. | Did you make any balance transfers from one credit card to another credit card in the 90 days prior to the date your case was filed? | ☐ Yes | ☑ No |
| 17. | Did you pay any money to, or transfer anything else to, any of your relatives within the two years prior to the date your case was filed? | ☐ Yes | ☑ No |
| 18. | Did you sell, give or otherwise transfer anything of value in excess of $1,000 to anyone within four years prior to the date your case was filed (except for trading in a car to a dealer)? | ☐ Yes | ☑ No |
| 19. | Are you involved in a lawsuit, or do you feel that you have any basis for filing a lawsuit against anyone? | ☐ Yes | ☑ No |
| 20. | Are there any federal or state tax returns you were required to file that were not filed at the time your case was filed? <br> Last tax return filed for the year _2013_ . | ☐ Yes | ☑ No |
| 21. | Are you entitled to any tax refunds or believe you have a basis for amending any previous years return? | ☐ Yes | ☑ No |
| 22. | Did you review and sign a complete copy of your petition and schedules prior to the time your case was filed? | ☑ Yes | ☐ No |
| 23. | Have you surrendered property or otherwise performed your intentions as stated on the Statement of Intention filed with your bankruptcy schedules? If not do you intend to? | ☑ Yes | ☐ No |
| 24. | Did you read and understand the information sheet handed out this morning? | ☑ Yes | ☐ No |
| 25. | Did you hear the Trustee's instructions in their entirety and understand these instructions? | ☑ Yes | ☐ No |

By my signature below and by my submission to this questionnaire to the Trustee, I acknowledge that the answers proved above are my own and that they are true and correct to the best of my knowledge and that I have answered these questions under penalty of perjury. I further understand that these answers will be adopted as testimony in my §341 meeting to the same extent as if I had orally testified.

Signature: _Joyce Crawford_　　　　　　　　　Date: _2/3/16_

Amount Needed
Now.
112,900
72,000
$ 184,900 Total

EXHIBIT
H

04/01/2016

REF: Joyce Frink

Attached is the contracts I am under.

Please send me my funds ASAP as I am in distress..

My health is failing and I need the money to pay some medical bills, My monthly living expences and food. I am not working due to my illness.

Also I was under the belief that I would of already gotten the funds way before now. With that, I had put up 10,000.00 as a depostit on two properties, for a total deposit of 20,000.00.

I needed to purchase for myself and my family homes to live in.  The contracts are coming due now and if I cant pay them out by the due dates I will loose the deposit money.  Please help me with this asap. I dont want to loose my deposit monies.

I am under great stress with this. I would like you to please contact me asap with this matter. Please speed up my account so I will be able to resolve this problem about my home.

Sincerely,

Joyce Frink    1